Filed 3/6/17

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C072355 |
| v. | (Super. Ct. Nos. SF116240A, SF116240B, SF116240C) |
| ALBERTO FRANCISCO ORTEGA LARA et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, William D. Johnson, Judge.  Reversed in part and affirmed in part.

Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant Alberto Francisco Ortega Lara.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant Issiah Flores.

Michelle May Peterson, under appointment by the Court of Appeal, for Defendant and Appellant Aurelio Espinoza, III.

_____

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III through IX.

1

Kamala D. Harris, Attorney General, Gerald A. Engler, Michael P. Farrell, Assistant Attorneys General, Daniel B. Bernstein and Tia M. Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

Stephen Lucero was shot to death several hours after he and fellow gang members, defendants Alberto Francisco Ortega Lara, Issiah Flores, and Aurelio Espinoza, III, (collectively, defendants) burglarized a house in Stockton, taking an assortment of electronics and firearms from the house. Each defendant was charged with Lucero's murder (Count 1), residential burglary (Count 2), and gang participation (Count 11); defendants Flores and Espinoza were also charged with possession of a firearm by a minor and possession of ammunition by a minor (Counts 6 and 7); Flores was further charged with additional counts of possession of a firearm by a minor and possession of ammunition by a minor (Counts 9 and 10) and receiving stolen property (Count 8).[1] The murder charge alleged a principal was armed with a firearm during the commission of the offense. Gang enhancements were attached to Counts 2, 6, and 8.

Defendants were tried together before two separate juries, one determining Lara's guilt, the other determining that of Flores and Espinoza. Each defendant was convicted of murder (first degree as to Lara, second degree as to Flores and Espinoza), residential burglary, and gang participation. Flores was also convicted of the remaining counts charged against him; Espinoza was not convicted of the remaining counts charged against

---

[1]     Lara was additionally charged with possession of a firearm by a convicted felon, possession of ammunition by a convicted felon, and possession of a short-barreled rifle (Counts 3-5). He was further alleged to have a prior strike conviction. Before trial, the prosecution dismissed Counts 3 and 4 and the prior strike allegation. With respect to Count 5, the trial court granted Lara's motion for judgment of acquittal after the prosecution presented its case. We mention these charges no further.

him.  With respect to the counts of conviction, all enhancement allegations were found to be true.  Lara was sentenced to serve an indeterminate prison term of 25 years to life for the murder plus a consecutive determinate term of 12 years.  Flores was sentenced to serve an indeterminate prison term of 15 years to life for the murder plus a consecutive determinate term of 12 years.  Espinoza was sentenced to serve an indeterminate prison term of 15 years to life for the murder plus a consecutive determinate term of 10 years.

On appeal, defendants (1) challenge the sufficiency of the evidence to support their murder convictions.  They also (2) challenge the sufficiency of the evidence to support their gang participation convictions and the gang enhancement findings, addressing the import of our Supreme Court's recent decisions in *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*), and *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) in three rounds of supplemental briefing.  We conclude there was insufficient substantial evidence to support Lara's first degree murder conviction, requiring reduction of that conviction to second degree murder.  The evidence was also insufficient to support second degree murder convictions as to Flores and Espinoza, requiring reversal of their murder convictions.[2]  With respect to the gang evidence, we conclude the evidence admitted against defendants was sufficient to support the gang convictions and enhancement findings notwithstanding the additional "associational or organizational connection" requirement of *Prunty*.  (*Prunty*, *supra*, at p. 71.)  However, as we explain, because evidence establishing that required connection, as well as gang membership on the part of Flores and Espinoza, was admitted in violation of *Sanchez, supra*, 63 Cal.4th 665, and because admissions made by defendants during

---

[2]    This conclusion makes it unnecessary to address a number of defendants' additional claims on appeal, which, if meritorious, would operate only to reverse their murder convictions.

booking interviews were admitted against them in violation of *Elizalde, supra,* 61 Cal.4th 523, we must reverse the gang crime convictions and enhancements for these constitutional errors.[3]

Lara makes a number of additional claims of error that relate solely to his murder conviction. Specifically, he asserts (3) the trial court prejudicially erred by providing the jury with two erroneous instructions relevant to the natural and probable consequence theory of murder, (4) the trial court also prejudicially erred by failing to provide the jury with a unanimity instruction because the prosecution relied on multiple factual scenarios to support the murder charge, (5) the trial court further erred by failing to instruct the jury on attempted murder as a lesser included offense to murder, (6) Lara's trial counsel provided constitutionally deficient assistance by failing to request the jury be instructed regarding the effect of voluntary intoxication on Lara's ability to formulate the intent to kill or to aid and abet the murder, and (7) the prosecutor engaged in prejudicial misconduct by arguing inconsistent theories of the facts surrounding Lucero's death to the separate juries. We need not determine whether any of these assertions of error would have required reversal of Lara's first degree murder conviction because we have already determined that conviction must be reduced to second degree murder for insufficiency of the evidence. With respect to the validity of that reduced conviction, we conclude the foregoing assertions either lack merit or are harmless.

Finally, we address two remaining claims, one raised by Flores and Espinoza and the other raised by Espinoza alone: (8) the prosecutor engaged in prejudicial misconduct

---

[3] Because the evidence admitted by the trial court, despite having been erroneously admitted in violation of *Sanchez, supra* and *Elizalde, supra,* " 'would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial.' " (*People v. Story* (2009) 45 Cal.4th 1282, 1296-1297, quoting *Lockhart v. Nelson* (1988) 488 U.S. 33, 34 [102 L.Ed.2d 265].)

4

by arguing prosecutors are "advocates of the truth"; and (9) the trial court abused its discretion when it denied Espinoza's motion for mistrial, made after the prosecutor failed to redact certain references in Espinoza's police interrogation to his having previously been arrested for robbery. With respect to these claims, we conclude the prosecutorial misconduct claim does not require reversal. Nor did the trial court abuse its discretion by denying Espinoza's motion for mistrial.

In sum, with respect to Lara, we modify the judgment to reflect conviction of second degree murder and reverse his gang participation conviction and the gang enhancement attached to the burglary count, otherwise affirm, and remand the matter for resentencing. With respect to Flores and Espinoza, we reverse their second degree murder and gang participation convictions, as well as their gang enhancements, otherwise affirm, and also remand their matters for resentencing.

FACTS

### *The Burglary*

Because defendants concede they were appropriately convicted of committing a burglary on the night of October 30, 2010, we dispense with a detailed recitation of the evidence establishing their commission of this crime. The following summary will suffice to place the murder in context.

Lara was living at his grandmother's house with his girlfriend, Veronica Calvetti. The house had two driveways; the main driveway on the right of the house had a built-in carport covering the back of the driveway and a separate stand alone carport covering the front of the driveway. A blue minivan was parked under the rear carport, next to the front door. A large white truck was parked under the front carport, closer to the street.

5

The night of the burglary, Lara was hanging out in the main driveway beneath the carports (carport area) with fellow gang members Lucero, Flores, and Espinoza.[4] The four were drinking beer and smoking marijuana. Eventually, the party moved to the backyard, where they discussed breaking into a house one street away, behind the house that was immediately across the street. The plan was for Lucero to knock on the front door to make sure no one was home. Then, Flores and Espinoza (14 years old at the time) would act as lookouts while Lara (19 years old) and Lucero (32 years old) broke into the house. Calvetti, who was present for the conversation, decided to join in the endeavor as a lookout, freeing Flores up to enter the house with Lara and Lucero.

The burglary happened shortly before midnight. As planned, after it was determined no one was home, Lara, Lucero, and Flores entered the target house's backyard by breaking through a fence and then entered the house itself through a bathroom window. Once inside, they unlocked the back door and began carrying property back to Lara's house, depositing the stolen goods in Lara's backyard. Four trips to the house netted the burglars four flat screen televisions, two laptop computers, a portable DVD player with a monitor, a digital camera, a 35mm camera, two car rims, a Mossberg shotgun, and a non-operational .38-caliber handgun.

During the second or third entry into the house, a friend or cousin of Lucero, who went by the nickname Diablo, pulled up in a blue van and parked across the street from Lara's house. When Diablo arrived, he handed Lucero a handgun and joined in at least one trip inside the target house, carrying out one of the flat screen televisions. After the burglary was complete, Lucero gave the handgun back to Diablo. Diablo then joined the original burglars in Lara's backyard, where they discussed dividing up the loot. Lara and

---

**4**     Evidence relating to defendants' gang membership will be set forth in the discussion portion of this opinion.

6

Espinoza were each to keep one of the televisions, Lucero was to keep the shotgun, and Flores was to keep the .38-caliber handgun. Lara and Diablo then got into a heated argument because Diablo wanted to take one of the televisions, while Lara objected that "he didn't really do anything" to deserve any of the stolen items. Ultimately, Diablo settled for a couple of smaller items and left Lara's house.

The four original burglars returned to the carport area while Calvetti went inside the house and retired to Lara's bedroom. Sometime later, Lara and Lucero carried the remaining stolen items, with the exception of the car rims, to Lara's bedroom. They then returned to the carport area to continue drinking and smoking marijuana.

### The Murder

Lucero was murdered at about 5:30 a.m. He was shot multiple times in the carport area, pushed to the ground and kicked, dragged by two men to the sidewalk in front of a neighboring house, and then shot several more times by the passenger of a car that pulled up next to him as he lay bleeding on the sidewalk. Multiple witnesses saw or heard portions of these events as they unfolded. Because defendants challenge the sufficiency of the evidence to support their culpability for the murder, we summarize these witness accounts in detail.

Calvetti testified she was in Lara's bedroom when she heard an argument coming from the carport area. As far as she knew, defendants and Lucero were the only people at the house, aside from herself and various family members who were inside. During the argument, Lara yelled: "Nigga, give me the gun" or "Nigga, give me back the gun." Someone also yelled: "You don't want this, Nigga." Calvetti did not specify whether or not Lara made the latter statement. Calvetti also heard Flores say: "Calm down." According to Calvetti, she did not recognize two voices involved in the argument. Seconds later, Calvetti heard four gunshots. She went to a window at the front of the

7

house that had a partially obstructed view of the carport area, and saw Lucero being pushed to the ground and kicked. While she initially testified defendants were involved in this altercation, she then clarified she saw only shadows. However, after reviewing her preliminary hearing testimony, Calvetti testified the person who kicked Lucero was wearing a white shirt and each of the defendants was wearing a white shirt while hanging out after the burglary.[5] She also testified she did not see anyone other than the defendants in the carport area while Lucero was being pushed and kicked. But again, she admittedly saw only shadows and a white shirt at this point in time. As Lucero lay on the ground in the carport, Calvetti heard him ask Lara to call the police, using Lara's first name: "Albert call the cops." While Calvetti initially denied Lara came inside the house at this time, during the prosecution's redirect examination, after being reminded of her preliminary hearing testimony, she testified Lara did briefly come inside the house before returning outside and he had blood on his sweatpants when he did so.

A short time later, Calvetti heard additional gunshots that did not come from the carport area. Calvetti testified she was also at the front window when she heard these shots. She then noticed a four-door white car, "an old Lincoln or something," parked in front of Lara's house. Flores and Espinoza got into this car before it drove away toward the west.[6]

_____

[5] During cross-examination, Calvetti clarified that Espinoza was also wearing a black hooded sweatshirt.

[6] During cross-examination, Calvetti testified she was in Lara's bedroom, looking out his bedroom window, not the front window, when she saw the physical altercation and also when she heard the second round of gunshots. This window had a more obstructed view of where Lucero was attacked than the front window. Calvetti again testified she saw only shadows. During the prosecution's redirect examination, Calvetti returned to her previous testimony that she was at the front window when she saw Lucero being kicked.

8

According to Calvetti, Lara again came inside the house after the second round of gunshots, but before Flores and Espinoza departed in the white car. He was "crying," "hysterical," "pacing back and forth," and "walking in and out" of the house. After three or four of these trips outside, Lara went into the kitchen, where he wiped off his hands with a towel, took off his shirt and sweatpants, ran some water over them in the kitchen sink, and threw them in a basket in the laundry area near the kitchen. While Lara was doing this, Calvetti noticed he had a small cut on his knee. Lara then changed his clothes. Calvetti also testified Lara used her cell phone to call 911, but hung up before the call connected. Her testimony was unclear as to whether this happened before or after he changed his clothes. At some point after Lara aborted his call to 911, Calvetti made the call herself.

We also note Calvetti testified she saw Lara holding what she believed to be a .45-caliber handgun after the burglary, although she admitted to knowing very little about guns. She further testified she did not see any dark cars parked in front of Lara's house the morning Lucero was killed. These cars will become important later.

After the first round of gunfire and physical altercation in the carport area, Lucero was dragged to the sidewalk in front of an adult care home next door. Remedios Garcia witnessed the dragging from the kitchen window of another adult care home across the street. Garcia, who worked at that care home, testified she awoke to the sound of gunfire, ran to the kitchen window, and "saw two men dragging another man." The men doing the dragging were wearing white polo shirts and baseball hats. After depositing Lucero in front of the adjacent care home, they ran away toward the west. Garcia described them as Mexican and estimated their ages to be "around 25," adding during cross-examination she would not have confused them for young teenagers. She initially testified she knew Lara from across the street and he was not one of the men dragging Lucero. However,

9

during the prosecution's redirect examination, Garcia admitted she did not see their faces well enough to know whether or not Lara was one of them. After seeing these men run away, Garcia noticed a "long white car" parked in front of Lara's house. A man wearing a black jacket and dark beanie was standing in the street next to this car. Garcia did not get a good look at his face either. While Garcia did not see this man get into the car, he was no longer in the street when the car drove in the same direction as the two men who ran away. Garcia then left the window to tell her sister, who was in another room, what had happened. As she did so, she heard additional gunfire and returned to the window, where she saw the same white car heading in the opposite direction.[7]

William Stokes, who lived at the care home where Garcia worked, was outside smoking a cigarette when Lucero was murdered. Stokes suffered from schizophrenia, but was taking medication that alleviated his symptoms. He testified he was not impaired the morning of the murder. As Stokes sat on a milk crate toward the back of the care home's driveway, he heard the sounds of an argument coming from somewhere across the street. A loud voice said: "You don't want this, [expletive]." Stokes testified the voice was "kind of high-pitched" and sounded like that of a teenager. Stokes then heard several gunshots, a brief pause, and another round of gunfire. He explained the latter round of gunfire sounded "muffled." Due to his position in the back of the driveway, and the presence of a van parked in the front of the driveway, Stokes was unable to see what was happening across the street and did not try to get a better look for fear of being shot. However, according to Stokes, when he first sat down to smoke his cigarette, he noticed two "small cars, dark color," were parked across the street in front of Lara's house.

---

[7] Garcia contradicted her testimony concerning whether she saw the white car a second time that morning.

When police questioned Stokes following the murder, he stated he watched these cars park in front of Lara's house shortly before the argument.

Multiple calls were received by 911 dispatchers regarding the shooting. One of these calls came from Lucero. After being dragged to the sidewalk in front of the adult care home next door, Lucero managed to pull out his cell phone, dial 911, and say to the dispatcher, "I've been shot," before the second round of gunfire ended his life. These shots could be heard over the phone. Another call came from a man who lived a few houses to the west of the adult care home where Garcia worked. The man identified himself as Mike and told the dispatcher he heard gunshots, went outside his house and saw a gold Buick LeSabre-type car driving away to the west. The car contained two or three occupants who were either Black or Hispanic. Mike then saw a man lying on the sidewalk down the street to the east. The same car came back down the street in the opposite direction and stopped next to the man on the sidewalk. At this point, the front passenger got out of the car, stood over the man, and fired about five shots at point blank range. Mike did not testify at trial.

### Police Investigation

Police and emergency medical personnel arrived within minutes, but Lucero was already dead. He sustained a total of 10 gunshot wounds and multiple blunt force injuries. Six bullets struck him in the head from close range; four bullets struck his extremities, three of which were fired from a distance of greater than two feet. Four of the six head wounds would have been immediately fatal, while the other two also could have killed Lucero. Of the bullets that struck Lucero's extremities, one entered his right calf, causing several bone fractures and severing large blood vessels. This wound also had "a lethal capacity," but only "if left unattended." Based on the medical examiner's testimony, combined with the testimony and statements of witnesses who saw or heard

11

the events described above, it is reasonable to infer Lucero sustained most, if not all, of the gunshot wounds to his extremities and the blunt force injuries while in the carport area, while the immediately fatal head shots were sustained while he lay on the sidewalk in front of the adjacent adult care home.[8]

The physical evidence found at the scene indicates the same gun fired all of the shots. Six .40-caliber shell casings and multiple bullet fragments were located around Lucero's body. Three .40-caliber casings were found in the street in front of the carport area. In the carport area, police found additional bullet fragments, a live .40-caliber round, and a .40-caliber magazine containing additional live rounds; no corresponding weapon was found.[9] Six of the casings were compared by a firearms expert, who determined five were definitely fired from the same gun and the sixth was likely fired from the same gun. All of the bullet fragments, including several that were recovered from Lucero's brain during his autopsy, were consistent with having been part of a .40-caliber bullet. Those fragments that were amenable to a rifling analysis were determined to "most likely" have been .40-caliber bullets.

Lara remained at his house when police arrived and began their investigation. He was taken into custody and questioned by detectives. Two additional interviews were conducted the following day. We provide a summary of Lara's various statements later

---

[8]     One of the wounds to Lucero's extremities was to his left index finger. The bullet that caused this injury was fired from close range. This wound might have been inflicted on the sidewalk if Lucero instinctively attempted to shield his head from the fatal barrage.

[9]     Two additional magazines, both empty, were found in Lara's mailbox, one designed to hold .45-caliber rounds and the other designed to hold .22-caliber rounds, as well as one live .22-caliber round. A loaded .22-caliber rifle was found in a separate carport area on the opposite side of Lara's house, behind a washing machine. A live .38-caliber round was also found near this rifle.

in this factual recitation, after setting forth his trial testimony in some detail. When Lara was taken into custody, a white t-shirt he was wearing that had a blood stain on it was collected as evidence. Lara also had small cuts on his hands, including his knuckles, and a small cut on one of his knees.

Lara's house was searched the morning of the murder. In addition to the stolen items taken during the burglary, police found the towel Lara used to wipe his hands while in the kitchen that morning, as well as a white polo shirt and gray sweatpants, all wet, in the bottom of a clothes basket next to the kitchen. Each of these items tested positive for the presence of blood. A DNA analysis indicated Lara's blood was on the towel, while Lucero's blood was on the sweatpants. DNA was not able to be extracted from the blood stain on the polo shirt. However, Lucero's blood was also on the white t-shirt collected from Lara when he was taken into custody.

Flores and Espinoza were arrested two days after the murder. They were also interviewed by detectives. With respect to their statements, it will suffice to note each denied being present at Lara's house during the murder; and, while Espinoza eventually admitted participating in the burglary, Flores also denied involvement in that endeavor.[10] During a search of the apartment where Flores lived with his mother and sisters, police found the non-operational .38-caliber handgun taken during the burglary, which was located inside a pocket of a pair of jeans that was inside a plastic bin.[11] About an hour

---

[10] These interviews were played for the Flores/Espinoza jury only.

[11] Also in the bin were two other pairs of jeans. The jeans containing the handgun did not test positive for the presence of blood, while the others did test positive for blood. A DNA analysis indicated Flores's own blood was on these jeans. A Glock 9mm-magazine containing 10 rounds and 17 rounds of .22-caliber ammunition were also found in a separate bin in Flores's apartment.

13

after Flores was taken into custody, an officer who was watching Flores's apartment noticed a group of people, including Flores's older brother Ray, entering a different apartment in the same complex. When that apartment was later searched, police found three live .40-caliber rounds.[12] At some point, Flores's mother was also questioned by police. She stated Ray owned a small, four-door white car that looked like an older Jeep. At trial, she testified the car belonged to Ray's girlfriend and was sold before the murder occurred.

### Lara's Testimony

Lara testified in his own defense. Lara testified he and Calvetti were at his house the day of the burglary. That morning, Lara drank some beer and smoked some marijuana. Flores and Espinoza arrived sometime during the day; Lucero showed up in the early evening. The four drank beer together and discussed breaking into a nearby house. With a few minor exceptions, Lara's testimony concerning the subsequent burglary and his argument with Lucero's friend or cousin concerning the latter's desire to take one of the stolen televisions tracked that of Calvetti. Lara also confirmed he and Lucero brought the stolen items into his bedroom later that night, Calvetti was lying down on his bed when they did so, and they then rejoined Flores and Espinoza outside.

Turning to the murder, Lara testified a dark car pulled up and two "older guys" got out. One of the new arrivals was "a big dude" with "long hair," while the other was wearing an Oakland Athletics beanie. The man wearing the beanie was Mexican and taller than Lara, who stood about 5 feet 2 inches in height. Lara thought he heard Lucero call this man, "Demon." According to Lara, he and Lucero showed Demon one of the

---

[12] The house where Espinoza lived with his mother and sisters was also searched. Aside from some evidence of gang affiliation, nothing of evidentiary value was recovered during this search.

14

televisions, which Lara claimed was in the backyard. Apparently uninterested in buying the television, Demon returned to the front of the house with Lucero. Lara joined them. The other new arrival was also there. Lara did not remember where Flores and Espinoza were at this time. Lucero and Demon talked for a while and then began to argue, about what, Lara did not know. Demon then pulled out a handgun. Lara said something like, "Get that shit out of here." When Lucero started to walk away, Demon shot him in the leg. Lara ran into the backyard. He then looked back and saw Demon hitting Lucero, he believed with the gun. The next thing Lara remembered was Demon dragging Lucero toward the street by his legs. Lara did not come to Lucero's aid because Demon "had a gun" and Lara was "drunk, high." Lara then heard a car drive away and went to the front yard to see where Lucero had been dragged. It was at this point, according to Lara, Lucero said: "Bert, call the cops." When Lara went into the house to call the police, he heard the second round of gunfire. Lara denied arguing with Lucero after the burglary, denied shooting him in the leg, denied hitting or kicking him, denied dragging him out of the carport area, denied shooting him in the street, denied seeing Flores or Espinoza do any of these things, and denied telling either of them to do so.

According to Lara, after the second round of gunfire, he used Calvetti's cell phone to call 911, although he did not remember actually talking to anyone. He then noticed he had blood on his sweatpants, took them off, wetted them down to try to get the blood off because he was "sick" and "mad" about the shooting, and threw them in with the dirty laundry. He denied wetting down any shirts and claimed the white polo shirt found in the laundry basket belonged to his cousin. With respect to the towel that was also found in the laundry basket, Lara claimed to have cut his hand while using a window punch tool to break a beer bottle sometime before the burglary, after which he wiped the blood off his hand with a towel and threw it in with the dirty laundry. Lara claimed he got the injury to

15

his leg earlier that night as well, when he tried to kick his dog to prevent him from getting out and instead ended up hitting his leg against a gate. He also might have received one of the injuries to his hands from the incident with the dog.[13]

As previously noted, Lara's testimony that a dark car pulled up to the house was corroborated by Stokes's testimony and prior statement to police, although Stokes said there were two dark cars, which matches Lara's statements to detectives (see below). However, as also mentioned, Calvetti testified she did not see any dark cars parked in front of Lara's house the morning Lucero was killed. Nor did Garcia notice any dark cars parked in front of Lara's house that morning.

### Lara's Statements to Detectives

Lara's prior statements to detectives were admitted into evidence during the prosecution's case in rebuttal.

With respect to the burglary, early in the first interview, Lara claimed the property taken during the burglary belonged to Lucero, and Lara was just "holding it for him." He claimed Lucero and "a couple other fools" he did not know committed the burglary. A short time later, Lara admitted he was "not being honest" about the burglary and confessed: "I ain't gonna lie, we did break into that piece of shit. Stole it. Stole the stuff, brought it over. Shit." We mention his burglary-related statements no further.

---

[13] When asked during cross-examination about the magazines found in his mailbox, Lara claimed a friend of his grandmother brought them over the day of the burglary and asked Lara to try to sell them. Lara also claimed one of his friends brought over the rifle that was behind the washing machine on the other side of the house earlier in the day, but he did not remember why he did so. During his statements to detectives, however, Lara said the friend who brought the rifle over was Flores's brother Ray who did so because Espinoza previously "got jumped" and "beat up" by some Sureño gang members and Lara wanted him to have a weapon at the house in case they came back.

With respect to the murder, Lara denied involvement throughout the three interviews, describing Lucero as "my boy" and "my big homie." He also denied any involvement on the part of Flores and Espinoza, whom he referred to as his "little friends," adding: "Them fools ain't gonna shoot that fool. [They] are only fourteen, fifteen."

Lara's account of who did shoot Lucero was vague and changed as the interviews progressed. In the first interview, he claimed a man in his mid-20s with a fade haircut and wearing an "A's hat or some shit like that" pulled up in a small dark car, got out, and started "talking cool" with Lucero towards the front of the carport area. Lara was sitting down on a chair behind the blue minivan that was in the rear carport while this conversation took place. At some point, the man started "fucking with" Lucero "over some bullshit" and pulled out a gun. When Lucero started to walk away, the man shot him multiple times. According to Lara, Lucero appeared to have been shot in the face, back, and legs. Lara "cutted" to his backyard. He believed the man then dragged Lucero into the street, but stated he did not actually see the dragging. When the shooter left, apparently in the dark car, Lara went out front to check on Lucero and heard him calling out: "Bert, call the cops." Lara went back to the house to do so, at which point, "the car came back and finished him off." Lara did not say what Espinoza was doing during the argument and shooting, but claimed he "cutted after all that happened." He initially claimed Flores left before the incident, but then admitted he was there as well.

When the detectives told Lara other people had implicated him as being involved in the murder, Lara added to his account that "some other fools" pulled up in a second dark car, but this other car "took off" before the shooting started. Lara also added details to the argument that transpired before the shooting. Specifically, Lara claimed the shooter said to Lucero, "you fucked up" and "get out of here," and then Lara told the

17

shooter to "get that shit up out of here," apparently referring to the gun. Later in the interview, he stated Flores and Espinoza "probably hopped the other car and took off." When the detectives accused Lara of being the shooter, he denied it and asked that his hands be tested for gunpowder residue. Lara denied getting into an argument with Lucero that morning, denied either Flores or Espinoza got into an argument with Lucero, and when one of the detectives asked who "had the argument over the gun" and who "was yelling to give him back the gun," Lara denied any such argument occurred. When the detectives indicated they did not believe him, Lara said: "Well, what am, what am I supposed to do, man? I'm supposed to snitch? [¶] . . . [¶] And just tell it? And then I end up dead?" Towards the end of the first interview, Lara added the shooter had "one boy with him," but provided no description of this other person.

With respect to some of the physical evidence, Lara admitted he was wearing gray sweatpants when Lucero was murdered. He said he took them off afterward because he got blood on them when Lucero was shot in the carport area and fell to the ground. His statement is not very clear with respect to how he got the blood on his sweatpants. He appears to have claimed that when Lucero was shot, he immediately went to where Lucero fell to the ground and picked up some "broken glass[]," apparently from some bottles that also fell to the ground at the same time, and while he was "[p]icking up all that bullshit," the man who shot Lucero "started coming" toward them, and it was at that point Lara ran to the backyard. With respect to the .40-caliber magazine that was found in the carport area, Lara denied knowing where it came from. Lara denied ever possessing a .40- or .45-caliber handgun. Lara also claimed the injury to his knee happened when he tried to kick his dog at some point before the murder and he injured his knuckles playing with the window punch tool.

18

At the start of the second interview, Lara stated the man who shot Lucero pulled up in a car, got out and started talking to Lucero, "everything was cool." Then, another car pulled up, another man got out, and everything was still "cool," until the first man "started shooting, that's when everybody started taking off." Lara added that Lucero was walking from the street in front of the carport area back to the minivan in the rear carport when the shooter, who was still in the street, pulled out a gun and started shooting, hitting Lucero in the leg. According to Lara, the shooter then walked up to Lucero, "they were wrestling" and "fighting," and then the shooter dragged Lucero out of the carport area and left him in front of the adjacent house. Unlike the first interview, Lara claimed to have seen the dragging in this interview. He also claimed he did not go to Lucero's aid because he was afraid of getting shot and "didn't know what to do." Lara then stated the man who was with the shooter was dressed "all in black" and "was standing right there like he had his back in case anything happens." At some point during these events, or as Lara put it, "when that bullshit was going on," some of his friends pulled up in another car, but they "just pulled up at the wrong time" and drove off when "they seen what was going on." When one of the detectives asked what Flores and Espinoza were doing, Lara answered: "I don't know, I don't even fuckin' remember if they were there." Lara again denied he nor Flores or Espinoza was involved in the murder and told the detectives to "ask witnesses, they seen the cars pull up." He then stated he believed Flores and Espinoza got into the "other car that pulled up" that he claimed was "a white Jeep, like, some shit like that."

During the third interview, one of the detectives asked Lara whether he helped the shooter drag Lucero in order to get him off of Lara's property, which Lara denied. Lara then asked to "start from the beginning." In another iteration of the events leading to Lucero's murder, Lara claimed the shooter pulled up, got out of the car, and started

19

talking to Lucero in the front yard, "it was all good." Then, Lucero asked Lara to show the new arrival the televisions taken during the burglary. Lara went into his bedroom to do so. The man was supposed to come to his bedroom window to look at the televisions. When Lara opened the window, Flores and Espinoza told him Lucero and the man were arguing. Lara then "hopped out the window" and returned to the front, where the argument was happening. At this point, according to Lara, the shooting and other events he previously described occurred. Lara again denied being involved. Later in the interview, Lara added that Flores's brother Ray was in the car Flores and Espinoza got into when they left as the shooting was happening in the carport area. He also told detectives he believed the shooter went by the nickname, "Demon."

## DISCUSSION

We first address two sufficiency of the evidence claims raised by all defendants, concluding: there was insufficient substantial evidence to support Lara's first degree murder conviction, requiring reduction of that conviction to second degree murder; there was also insufficient substantial evidence to support second degree murder convictions as to Flores and Espinoza; and there was insufficient substantial evidence to support the gang crime convictions and gang enhancement findings as to all defendants, but these convictions and enhancements must nevertheless be reversed for related constitutional errors. We then address Lara's remaining contentions, concluding each either lacks merit or was harmless. Finally, we address and reject two remaining contentions, one raised by Flores and Espinoza and the other raised by Espinoza alone.

20

SUFFICIENCY OF THE EVIDENCE CLAIMS

I

***Sufficiency of the Evidence to Support the Murder Convictions***

Defendants challenge the sufficiency of the evidence to support their murder convictions.  We conclude there was insufficient substantial evidence to support Lara's first degree murder conviction, requiring reduction of that conviction to second degree murder.  The evidence was also insufficient to support second degree murder convictions as to Flores and Espinoza, requiring reversal of their murder convictions.

**A.**

***Legal Principles***

"'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]' [Citations.]  All conflicts in the evidence and questions of credibility are resolved in favor of the verdict, drawing every reasonable inference the jury could draw from the evidence. [Citation.]  Reversal on this ground is unwarranted unless '"upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]  This standard applies whether direct or circumstantial evidence is involved. [Citation.]" (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 226-227.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (Penal Code, § 187, subd. (a).)[14]  "Such malice may be express or implied." (§ 188.)  Express malice "requires an *intent to kill* that is 'unlawful' because . . . '"there is no

---

[14]     Undesignated statutory references are to the Penal Code.

justification, excuse, or mitigation for the killing recognized by the law.'" [Citation.] [¶] Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

"All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.) "If the defendant himself [or herself] commits the offense, he [or she] is guilty as a direct perpetrator. If he [or she] assists another, he [or she] is guilty as an aider and abettor." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) "[A]ider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*Ibid.*) The latter aiding and abetting requirement is satisfied where the aider and abettor "by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

Moreover, an aider and abettor "'is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." (*People v. Medina* (2009) 46 Cal.4th 913, 920.) "Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.] [¶] '[A]lthough variations in phrasing are found in decisions addressing the doctrine—"probable and natural," "natural

and reasonable," and "reasonably foreseeable"—the ultimate factual question is one of foreseeability.' [Citation.] Thus, "'[a] natural and probable consequence is a foreseeable consequence" . . . .' [Citation.] But 'to be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough . . . ." [Citation.]' [Citation.] A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. [Citation.]" (*Ibid.*)

**B.**

*Analysis*

We first note, as the Attorney General acknowledges in her briefing on appeal, there was no direct evidence establishing who shot Lucero in either the carport area or on the sidewalk next door. According to the Attorney General, however, the circumstantial evidence establishes the shooter (or shooters) must have been one of the defendants (or a combination of the defendants).[15] This assertion is based on the view defendants were

---

[15] The notion there may have been two shooters appears to be based on a misunderstanding of the ballistics evidence that may owe its genesis to the prosecutor's closing argument, wherein the prosecutor argued two guns were used to murder Lucero and claimed two live .38-caliber rounds were found at the scene, one in the carport area and one located near the .22-caliber rifle on the other side of the house. However, only one such round was found, near the rifle. The other live round that was found in the carport area was a .40-caliber round. Moreover, all of the *expended* shell casings found at the scene were of the .40-caliber variety. The fact a single unfired .38-caliber round was found on the other side of the house from where the shooting and altercation occurred in the carport area is not evidence a .38-caliber gun was fired that morning. The prosecutor also relied on the fact many of the bullet fragments recovered from the scene were copper jacketed, while a bullet core found in the carport area did not have a copper jacket, and claimed this bullet core was probably "a different type of bullet." However, the firearms expert specifically testified this bullet core was once part of a copper

23

"the only people present" in the carport area before, during, and after the murder, a view the Attorney General claims is a reasonable inference from the testimony of Calvetti and Garcia. With respect to the defendants who did not pull the trigger, the Attorney General argues they aided and abetted in the murder, relying on evidence of their "companionship and presence at the crime scene" and their "actions immediately before and after Lucero was shot," factors the Attorney General claims support a reasonable inference they shared the shooter's murderous intent and assisted in the achievement of the crime. Specifically, the Attorney General argues substantial evidence supports the view each defendant participated in the assault on Lucero that followed the shooting in the carport, after which Lara and either Flores or Espinoza dragged Lucero next door, all three were in the white car that pulled up to Lucero moments later, one of them fired the fatal shots, and all three then fled, Flores and Espinoza in the white car and Lara back to his house. Finally, the Attorney General argues the same evidence supports defendant's murder convictions based on the natural and probable consequences doctrine because, at the very least, each defendant aided and abetted the assault with a firearm in the carport area, and the murder that followed was a reasonably foreseeable consequence of that assault.

We disagree with the Attorney General's underlying premise the evidence establishes defendants were the only people in the carport area at the time Lucero was assaulted with a firearm therein. While there is substantial evidence each defendant was

---

jacketed round and it could have been a .40-caliber round based on its diameter. The prosecutor was simply mistaken about this evidence. Finally, the prosecutor further relied on the empty magazines (one designed to hold .45-caliber rounds and the other designed to hold .22-caliber rounds) and one live .22-caliber round found in the mailbox. Just as one unfired .38-caliber round on the other side of the house is not evidence a .38-caliber gun was fired the morning of the murder, we fail to see how two empty magazines and one unfired .22-caliber round in the mailbox is evidence either a .22-caliber or a .45-caliber gun was *fired* that morning. There is simply no substantial evidence two guns were used to murder Lucero.

24

there at this time, the only evidence they were the *only* people there came from Calvetti, who testified she did not see anyone other than the defendants in the carport area while Lucero was being pushed and kicked. However, her view of the carport was obstructed and she admittedly saw only shadows and someone wearing a white shirt at this time. Calvetti also testified she heard two voices she did not recognize during the argument that preceded the shooting in the carport area, indicating there may have been two additional people there when the carport altercation occurred. Lara testified two people pulled up in a dark car just before that altercation, the shooter and another man. In his prior statements to police, Lara said two dark cars pulled up. While these statements were inconsistent with each other, and with his trial testimony, the presence of two dark cars parked in front of Lara's house at the time of the shooting was corroborated by Stokes's testimony. We also note the presence of these cars was contradicted by other testimony, i.e., that of Calvetti and Garcia, and the jury was free to reject Lara's testimony in its entirety. However, because Calvetti's testimony makes room for the possibility two other people were there during the carport altercation, we cannot conclude there is any solid evidence defendants were the *only* people in the carport area. This conclusion prevents us from reaching the further conclusion, as the Attorney General would have us do, that because defendants were the only people there, one of them must have been the shooter and the others accomplices.

We now proceed with an assessment of the evidence presented against each defendant.

### 1. *Evidence Against Lara*

There is no dispute Lara was in the carport area with Flores, Espinoza, and Lucero when the argument overheard by Calvetti and Stokes occurred, although, as mentioned, there may or may not have been two additional people present. Substantial evidence also

25

supports the fact Lara participated in the argument, yelling: "Nigga, give me the gun" or "Nigga, give me back the gun." Under the prosecution's theory of the facts, this statement was directed at Lucero, who had taken Lara's gun. Lucero was, after all, the one who was shot, pushed to the ground, and kicked shortly after Lara made the statement. Calvetti also testified she saw Lara holding what she believed to be a .45-caliber handgun after the burglary. Lucero was shot with a .40-caliber handgun that could have been the gun Calvetti previously saw in Lara's hands. She admitted to knowing very little about guns, so it is entirely possible she was mistaken about the caliber. Thus, Lucero might have taken Lara's gun, prompting Lara to take it back, shoot him with it, push him to the ground, and then kick him as he lay bleeding on the ground. And because the ballistics evidence indicates the same gun was used to finish Lucero off next door, it is also possible Lara pulled the trigger there as well. But "possible" is not enough to support a first degree murder conviction.

However, in order to find sufficient substantial evidence to support Lara's first degree murder conviction, we need not determine whether the evidence sufficiently establishes he was the shooter. Even if someone else pulled the trigger, as long as Lara "aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission," he is guilty of murder; if he did so "willfully, deliberately, and with premeditation," that murder is of the first degree. (*People v. Chiu* (2014) 59 Cal.4th 155, 167 (*Chiu*)).) But if the evidence is sufficient to establish only that Lara aided and abetted an assault with a firearm in the carport area and the subsequent murder was a natural and probable consequence of that assault, we must modify the judgment to reflect conviction of second degree murder. As our Supreme Court recently held, "punishment for second degree murder is commensurate with a defendant's culpability

26

for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Id*. at p. 166.)

We conclude the evidence was sufficient to support only a second degree murder conviction under the natural and probable consequences doctrine. In addition to being present in the carport area and participating in the argument, there was evidence Lara participated in beating Lucero and then dragged him next door. Specifically, Calvetti testified the person she saw kicking Lucero while he was on the ground was wearing a white shirt and Lara was wearing such a shirt following the burglary, which he removed following the murder, rinsed in the kitchen sink, and then threw in a laundry basket. This white shirt was a polo shirt. Garcia testified the two men she saw dragging a third man to the sidewalk next door were wearing white polo shirts and appeared to be Mexican and around 25 years old. While Garcia initially testified Lara was not one of these men, she later admitted she did not see their faces well enough to know whether Lara was one of them. That Lara was one of the men Garcia saw dragging Lucero next door is also supported by the fact Lara was the only one with a strong motive to move Lucero's body away from his house. Lara then returned to the house, where he removed not only the polo shirt, but also a pair of sweatpants he was wearing, rinsed them off in the kitchen sink, and threw them in a laundry basket. There was blood on both items, as well as on a white undershirt Lara did not rinse off or hide in the basket. While DNA was not able to be extracted from the bloodstain on the polo shirt, that extracted from bloodstains on the sweatpants and the undershirt matched Lucero's DNA. Lara also had small cuts on his hands, including his knuckles, and one on his knee when he was taken into custody that morning, providing further evidence he participated in the beating in the carport area. Nor did Lara provide a plausible explanation for how he received these injuries, or how

27

Lucero's blood got onto his clothes, during either his police interviews or his testimony at trial.

While the foregoing evidence sufficiently establishes Lara aided and abetted an assault with a firearm in the carport area, there is little more than speculation to suggest he pulled the trigger, either in the carport area or on the sidewalk next door, or that he willfully, deliberately, and with premeditation, aided or encouraged the commission of *murder* with knowledge of the shooter's unlawful purpose. During his police interviews, Lara asked for his hands to be tested for gunpowder residue. They apparently tested negative. Nor was there any evidence such residue was found on his clothing. The only direct evidence as to the shooter's identity came from Lara, who testified the shooter was a man Lucero called "Demon." While the jury was not required to accept Lara's account of events, "merely disbelieving" him does not amount to "evidence" Lara was in fact the shooter, or if the jury did believe Demon was the shooter, that Lara willfully, deliberately, and with premeditation, aided and abetted in the murderous act. (*People v. Drolet* (1973) 30 Cal.App.3d 207, 217.)

We acknowledge the evidence establishing Lara aided and abetted an assault with a firearm in the carport area, recounted above, raises a strong suspicion he also either fired the fatal shots or aided and abetted the person who did so, but "evidence that merely raises suspicion, no matter how strong, of the guilt of a person charged with a crime is not sufficient to sustain a verdict and judgment against him [or her]." (*People v. Draper* (1945) 69 Cal.App.2d 781, 786.) "Suspicion . . . merely raises a possibility, and this is not a sufficient basis for an inference of fact." (*People v. Blakeslee* (1969) 2 Cal.App.3d 831, 837.) The evidence also supports an equally strong possibility Lara, after aiding in Demon's commission of an assault with a firearm in the carport area and dragging Lucero next door to prevent police from investigating his house (where items stolen in the

28

burglary were located), he returned to the house to destroy evidence of his participation in the assault, at which point Demon executed Lucero on the sidewalk without Lara knowing he intended to do so. Indeed, this possibility has more support in the record than the possibility Lara pulled the trigger himself. As mentioned, while admittedly self-serving, Lara's testimony supports this version of events. His account of Demon arriving with another man in a dark car, and previous statements two such cars pulled up, was corroborated by Stokes's testimony. That two additional people were there during the argument that preceded the carport shooting was also corroborated by Calvetti's testimony she heard two voices she did not recognize. This version of events also makes (at least some) sense of the fact Lucero called out to Lara to call the police. If another man pulled the trigger in the carport area, even if Lara felt obliged to join in the beating that followed and then dragged Lucero next door to cover up the assault, Lucero might still see Lara as his best chance at getting help. Had Lara been the shooter, it seems far less likely Lucero would have been urging him to call the police *on himself*.

While "it is the jury, not the appellate court which must be convinced of the defendant's guilt" (*People v. Bean* (1988) 46 Cal.3d 919, 933), in order to affirm, we must be able to conclude the evidence is sufficient to have convinced that jury of the defendant's guilt beyond a reasonable doubt. The evidence must be "solid, substantial, and [must] reasonably inspire confidence in defendant's guilt." (*People v. Blakeslee*, *supra,* 2 Cal.App.3d at p. 839.) We conclude the evidence is sufficiently solid and substantial to reasonably inspire confidence in Lara's participation in the assault with a firearm that led to Lucero's murder, but not so with respect to the conclusion he willfully, deliberately, and with premeditation, murdered Lucero or aided and abetted the commission of the murder. Having so concluded, we must further determine whether the jury could have reasonably found the murder that followed was a natural and probable

29

consequence of the assault with a firearm. The evidence was more than sufficient to support such a finding.

Gang-related assaults, even those committed without firearms, routinely escalate into shootings. In cases where a murder arises out of such an assault, appellate courts routinely conclude the evidence sufficiently supports the jury's implied finding the murder was a foreseeable consequence of the assault. (See, e.g., *People v. Medina* (2009) 46 Cal.4th 913, 927-928 ["defendants would have or should have known that retaliation was likely to occur and that escalation of the confrontation to a deadly level was reasonably foreseeable"]; *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1450 [fatal shooting was a natural and probable consequence of aiding and abetting an assault with a deadly weapon during a gang confrontation]; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10 [fatal shooting was a natural and probable consequence of a gang fight]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376 ["escalation of this confrontation to a deadly level was much closer to inevitable than it was to unforeseeable"].)

Here, as we explain in greater detail later in this opinion, the evidence sufficiently establishes defendants and Lucero were gang members who committed the burglary that preceded Lucero's death for the benefit of their gang. These gang members were no strangers to guns—guns were taken during the burglary, Lucero's cousin gave him a gun to carry during the commission of the burglary, and various guns and ammunition were found strewn around Lara's front yard and carport areas. While the assault was not gang-related, at least not in the sense of being a fight between rival gang members, it resulted either from a dispute over property division (under the prosecution's view of the evidence) or from some unknown beef between Lucero and Demon (according to Lara's testimony). Either way, that assault was carried out by gang members against another gang member and, most importantly, was an assault *with a firearm*. Even if all Lara did

30

was aid and abet Demon's act of shooting Lucero in the carport area and then drag him next door, a rational jury could have found the subsequent murder was a reasonably foreseeable consequence of these actions.

In sum, while there is insufficient substantial evidence to support Lara's first degree murder conviction, there is such evidence supporting conviction of second degree murder under the natural and probable consequences doctrine. We therefore modify the judgment to reflect a conviction of second degree murder.

### 2. *Evidence Against Flores and Espinoza*

There was even less evidence either Flores or Espinoza shot Lucero, either in the carport area or on the sidewalk next door to Lara's house. Indeed, even Lara, who had great incentive to implicate them in the crime (if only to exculpate himself), said during one of his police interviews: "Them fools ain't gonna shoot that fool. [They] are only fourteen, fifteen."

However, for reasons already expressed, if Flores and Espinoza aided and abetted the assault with a firearm in the carport area, they are also guilty of second degree murder under the natural and probable consequences doctrine. As previously mentioned, while Calvetti initially testified Flores and Espinoza were involved in "pushing" Lucero to the ground after he was shot in the carport area, she immediately clarified she saw only shadows at this time, and later added that the person who kicked Lucero was wearing a white shirt. While this testimony and other evidence recounted above (e.g., blood evidence on Lara's white shirts and sweatpants, Lara's attempt to destroy this evidence, injuries to his knuckles) supports a reasonable inference Lara participated in this assault, not so with respect to Flores and Espinoza. With respect to these defendants, there was evidence they were present when the assault occurred, were Lara's companions, left the scene in a vehicle associated with Flores's brother after the murder, and lied during their

31

police interviews.  We must decide whether this is enough to support their murder convictions.  We conclude the answer is no.

"Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider in assessing a defendant's criminal responsibility.  [Citation.] Likewise, knowledge of another's criminal purpose is not sufficient for aiding and abetting; the defendant must also share that purpose or intend to commit, encourage, or facilitate the commission of the crime.  [Citation.]"  (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530.)  Along with presence at the scene of the crime and failure to prevent it, "companionship" and "conduct before and after the offense," including "flight," are relevant to the jury's determination as to whether a defendant aided and abetted in the commission of the crime.  (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094-1095 (*Lynette G.*).)  Moreover, deliberately false statements made to authorities concerning the offense may also be taken into consideration by the jury in assessing a defendant's criminal responsibility, as such statements may evidence a consciousness of guilt.  (See *People v. Kimble* (1988) 44 Cal.3d 480, 496.)

Here, there is no dispute Flores and Espinoza were present in the carport area when Lucero was assaulted with a firearm.  As already explained, substantial evidence supports the view Lara participated in that crime.  And, as we explain more fully later in this opinion, Flores and Espinoza were gang member companions of Lara.  But the inference that might otherwise arise from their companionship, i.e., Flores and Espinoza likely assisted their companion or encouraged him in the commission of the crime, is substantially undermined by the fact Calvetti heard Flores say, "[c]alm down" during the argument that preceded the assault.  It is unclear to whom Flores directed these words of de-escalation, but they certainly do not evidence an intent to aid or encourage the assault

32

that followed. Quite the contrary. There is no evidence Espinoza said anything during the argument. However, viewed together, the police statements of Flores and Espinoza suggest they were loyal to each other before they were loyal to Lara.[16] Thus, to the extent "companionship" would have influenced Espinoza to aid or encourage Lara to assault Lucero, it would have had an equal or greater pull on him to follow Flores's calming lead. Simply put, even viewed in the light most favorable to the prosecution, as we must, the "companionship" factor is a wash.

This brings us to their "conduct before and after the offense." (*Lynette G.*, *supra*, 54 Cal.App.3d at p. 1094.) There is no dispute they committed a burglary with Lara and Lucero before the latter was murdered. But this simply went to their companionship with Lara, and to each other, which we have already addressed.

Flores and Espinoza also fled the scene of the crime. However, flight may also "be explained by a desire merely to disassociate oneself from an unexpected criminal activity." (*Lynette G.*, *supra*, 54 Cal.App.3d at p. 1095.) For example, in *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262 (*Juan H.*), a minor was with his older brother when the latter shot the victim with a shotgun. After the shooting, the shooter ran to his car and drove away while the minor ran home to his family's trailer. (*Id.* at p. 1267.) With respect to flight, the Court of Appeals for the Ninth Circuit held: "No reasonable trier of fact could find evidence of criminal culpability in the decision of a teenager to run home from the scene of a shooting . . . ." (*Id.* at p. 1277.) By way of contrast, in *Lynette G.*, a robbery case in which the minor appellant "fled with the perpetrator and two others after

---

[16] While Espinoza eventually admitted to the burglary, he initially denied even knowing who Flores was, and was very slow to acknowledge Flores's participation in that crime. And while Flores never admitted to the burglary, he did admit to hanging out at Lara's house that day and maintained throughout his interview he did not know Espinoza. This indicates a stronger desire to protect each other than to protect Lara.

the crime . . . and was still in their company shortly thereafter," the Court of Appeal held there to be sufficient evidence to support aiding and abetting liability and explained the trier of fact could reasonably "have concluded that had [the minor's] flight been from fear of an unjustified charge of involvement, she also would have immediately disassociated herself from the other three girls." (*Lynette G.*, *supra*, at p. 1095.)

Here, like *Juan H., supra*, 408 F.3d 1262, the decision of Flores and Espinoza to flee the scene of a shooting does not support a reasonable conclusion they did so because of a consciousness of guilt rather than simple self-preservation or a desire to disassociate themselves from what had just occurred. While they left the scene together, in a white Jeep associated with Flores's brother, they each went to their respective homes and each disassociated themselves from Lara, who returned to his house to destroy evidence. Thus, unlike *Lynette G., supra*, 54 Cal.App.3d 1087, Flores and Espinoza immediately disassociated themselves from Lara and then each other. Nor are we persuaded the fact they left the scene together in the Jeep supports a contrary conclusion. It would have made little sense for either Flores or Espinoza to have fled the scene on foot when Flores's brother had a more efficient means of leaving the dangerous situation.

Flores and Espinoza also lied during their police interviews. Most importantly, each denied being present at Lara's house during the murder and Flores also denied involvement in the burglary that preceded it, although Espinoza eventually admitted participation in that endeavor. In *People v. Blakeslee*, *supra*, 2 Cal.App.3d 831, the Court of Appeal concluded the fact the defendant provided a false alibi to police on the night of the murder and denied knowledge of the existence of a rifle that was likely the murder weapon, did not supply substantial evidence of her guilt, explaining: "These falsehoods may form the basis for unfavorable inferences against her. [Citation.] But inferences of what? The refutation of these falsehoods did not directly implicate

34

defendant in the slaying. Rather their refutation merely destroyed defendant's asserted alibi for the time of the crime and rebutted her claimed ignorance of an accessible weapon which could have been used to commit the crime. This negation of a negative (she was not there) does not amount to affirmation of a positive (she did the shooting). Inferences drawn from her tender of a false alibi do not directly support a murder accusation against the defendant. While it is said that a false alibi tends to establish a consciousness of guilt [citation], the logical force of this deduction is weakened when there is some plausibility to the defendant's subsequent explanation of the reason for the falsehood." (*Id*. at p. 839.) That plausible explanation was the defendant was trying to protect her brother, who also had motive and opportunity to commit the murder of their mother. (*Id*. at pp. 839-840.)

There was also false alibi evidence in *Juan H.*, *supra*, 408 F.3d 1262. There, the Ninth Circuit concluded, "the determination . . . that the untrue statements Juan H. made to the police reflected consciousness of guilt is bare conjecture. Juan H. might have made a false statement to law enforcement for any number of reasons, especially given that any statements he made as a witness would likely be used to prosecute his older brother, a member of his immediate family. Although we must draw all reasonable inferences in favor of the prosecution, a 'reasonable' inference is one that is supported by a chain of logic, rather than, as in this case, mere speculation dressed up in the guise of evidence." (*Id*. at p. 1277.)

Here, too, the false statements made by Flores and Espinoza during their police interviews did not directly implicate them in the events leading to Lucero's death. While they might have lied because they were conscious of their complicity in Lucero's murder or the assault with a firearm that led to it, they might also have lied because they did not want to admit they were there and knew who murdered Lucero, especially if the shooter

35

happened to be their gang member friend Lara, or perhaps another gang member whom they might have feared (e.g., the "Demon" Lara claimed pulled the trigger). Moreover, Flores lied about both the burglary and about being present during the murder. He may have lied about the burglary because he was conscious of his guilt of that crime, and while he did not aid or abet the murder or assault with a firearm, decided admitting to being present during the murder would also have implicated him in the burglary he did commit. Further, while Espinoza did eventually admit to the burglary, as we have explained, he might have continued to lie about his whereabouts at the time of the murder in order to protect whoever pulled the trigger and prevent himself from acquiring the reputation of being a "snitch," which the gang expert testified was a dangerous reputation for a gang member to have. It may be observed these other possible reasons for lying to the police are speculative. While true, on the facts of this case, they are no more speculative than the assertion the lies were motivated by their consciousness of having aided and abetted the murder or assault with a firearm.

Finally, in addition to the Attorney General's underlying premise Lara, Espinoza, and Flores were the *only* people in the carport area at the time of the events leading to Lucero's death, which we have already explained is unsupported by substantial evidence, her briefing on appeal also assumes the car in which Flores and Espinoza left the scene i.e., the Jeep associated with Flores's brother Ray, was also the same car that pulled up to Lucero moments before, and from which the murderer stepped out and fired the fatal shots into Lucero's head. However, as the prosecutor acknowledged during her closing argument to Lara's jury, "there are so many car descriptions going on in this case that we'll never know what the real deal is." She then argued the gold car Mike, the witness across the street, saw pull up to Lucero "may have" been the white car in which Flores and Espinoza left the scene because the street lights might have caused that car to appear

36

gold rather than white, adding: "I don't know that, whether that occurred or not." This is pure and admitted speculation. Nor does the fact a single .40-caliber round was found in an apartment associated with Flores's brother prove the white Jeep was the car that pulled up to Lucero as he lay bleeding on the sidewalk.

In sum, with respect to the jury's conclusion Flores and Espinoza committed murder, either as direct perpetrators or aiders and abettors in the murder, or as direct perpetrators or aiders and abettors in the assault with a firearm that foreseeably resulted in the murder, we conclude the evidence was not sufficiently solid or substantial to reasonably inspire confidence in their guilt.

## II

### *Sufficiency of the Gang Evidence and Related Constitutional Claims*

Defendants also challenge the sufficiency of the evidence to support their gang participation convictions and the gang enhancement findings. Specifically, each defendant contends the evidence was insufficient to establish an "associational or organizational connection" between the Norteño gang in which they were convicted of participating, and found to have committed crimes to benefit, and the Norteño subsets whose members committed the predicate offenses and engaged in criminal primary activities, as required by our Supreme Court's recent decision in *Prunty*, *supra*, 62 Cal.4th 59. Flores and Espinoza bring additional challenges to the sufficiency of the evidence establishing these convictions and enhancement findings. We conclude each defendant's gang participation conviction and enhancement findings are supported by substantial evidence. However, as we shall explain, these convictions and enhancements must nevertheless be reversed for related constitutional errors.

37

## A.

### *The Street Terrorism Enforcement and Prevention* (*STEP*) *Act*

The STEP Act was enacted in 1988 "to seek the eradication of criminal activity by street gangs." (§ 186.21.) The STEP Act creates both a substantive offense for active participation in any criminal street gang (§ 186.22, subd. (a)) and an enhancement to be imposed where any person is convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)).

The elements of the substantive offense are: (1) "active participation in a criminal street gang, in the sense of participation that is more than nominal or passive," (2) "knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity," and (3) "the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.) The elements of the gang enhancement are: (1) commission of a felony "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) with "the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b).)

"To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457.) "A 'pattern of criminal gang activity' is defined as gang members' individual or collective 'commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' enumerated

38

'predicate offenses' during a statutorily defined time period. [Citations.] The predicate offenses must have been committed on separate occasions, or by two or more persons. [Citations.]" (*Ibid*.)

## B.

### *Gang Evidence Adduced at Trial*

To satisfy the "criminal street gang" requirement of both the gang crime and the gang enhancement, Detective Cesar Mercado testified there were over 1,500 validated Norteño gang members in Stockton as of 2010, "living in almost every neighborhood." The detective testified Norteño gang members in Stockton are divided into various subsets based on their geographical location within the city, e.g., East Side Stockton Norteños, West Side Norteños, Central Stockton Locos, North Side Norteños, South Side Stockton Norteños, and Triple Six Gangters (a subset formed out of the triple "S" of South Side Stockton). However, regardless of subset, Norteño gang members are associated with the Nuestra Familia prison gang and use the number 14, the color red, and the Huelga bird as common symbols. They also share a common enemy, Sureño gang members, who are associated with the Mexican Mafia prison gang and the color blue. The detective also testified one of the Norteño gang's primary activities is the commission of one or more of the criminal acts listed in section 186.22, subdivision (e), including murder, burglary, robbery, rape, and the trafficking of weapons and narcotics. With respect to the latter category of crimes, the detective recounted several police operations resulting in the arrests of Norteño gang members for drug trafficking and weapons offenses, including one operation that revealed members of the South Side Stockton subset were working with members of the East Side Stockton subset to sell narcotics and weapons. The detective then testified regarding two predicate offenses. The first predicate offense involved a Norteño gang member, who belonged to the Triple

39

Six subset, and who was convicted of two counts of possession of a controlled substance for sale and charged with, although not convicted of, possession of a firearm by a gang participant. He was, however, found to have been armed with a firearm during the commission of one of the narcotics offenses. The second predicate offense involved a Norteño gang member, who belonged to the East Side Stockton subset, and who was convicted of possession of an assault weapon and gang participation.

Turning to the defendants in this case, Detective Mercado testified each was an active Norteño gang member at the time the crimes in this case were committed. This conclusion was based in part on the fact each defendant admitted his gang membership during a booking interview.[17]

With respect to Lara, the detective testified to having reviewed several law enforcement contacts, including one in which Lara told officers he wanted to kill "scraps," a derogatory term used by Norteño gang members to refer to their Sureño rivals. On another occasion, Lara was contacted by police while associating with two other Norteño gang members, one of whom admitted to being a Norteño. While Lara and the other Norteño did not admit their gang member status, they were wearing red shirts. During other occasions, Lara was contacted while associating with a Norteño from the Triple Six subset. On two such occasions, Lara had a red bandana hanging out of his pocket. On one occasion, he admitted to being a Norteño but denied claiming any

---

**17** As we explain later in this opinion, these admissions were admitted into evidence in violation of *Elizalde*, *supra*, 61 Cal.4th 523. Other testimony offered by Detective Mercado ran afoul of *Sanchez*, *supra*, 63 Cal.4th 665. Nevertheless, in "reviewing the sufficiency of the evidence for purposes of deciding whether retrial is permissible, [we] must consider *all* of the evidence presented at trial, including evidence that should not have been admitted." (*People v. Story*, *supra*, 45 Cal.4th at p. 1296.)

40

particular subset. Lara also testified at trial he "claim[ed] Norteño" but did not "claim any particular set."

With respect to Flores, Detective Mercado testified to one police contact in which Flores was contacted with four other Norteño gang members, including his brother Ray. One of the other Norteños, a member of the Triple Six subset, was found to be in possession of a firearm. Two of the gang members were wearing red. The detective also testified one of the plastic bins located in the apartment Flores shared with his mother and sisters had "TSG 666" written on it, abbreviations for the Triple Six subset. We also note Flores had a red bandana tied to his belt loops on the front of his pants when he was taken into custody two days after Lucero's murder.

With respect to Espinoza, Detective Mercado testified to one police contact in which Espinoza was contacted with the same Triple Six gang member noted above as having been contacted with Flores. During this contact, Espinoza was identified by a citizen as belonging to a Norteño subset called Barrio Conway. The detective explained Barrio Conway was a validated Norteño subset during the 1980's that "kind of fizzled out" by the early 1990's and was "purged" from the Stockton Police Department's list of validated Norteño subsets shortly thereafter. The detective also explained in "recent years" there had been an "emergence of new Barrio Conway gang members that were seen tagging in the Conway area." However, because other subsets were more active in Stockton, the department did not have the resources to determine whether Barrio Conway should again be placed on its list of validated Norteño subsets. The detective also testified an item taken during the search of Espinoza's house had "2600 Conway" written on it, which indicated he lived on the 2600 block in the Conway area of Stockton. We also note when Espinoza was in juvenile hall following his arrest for the crimes

41

committed in this case, he was found to be in possession of a book with "Conway" and "BCW 2600 Block" written on it.

Additionally, the evidence in this case was essentially undisputed with respect to the fact Lara, Lucero, Flores, and Espinoza committed the burglary that preceded Lucero's murder. Detective Mercado testified Lucero was also a validated Norteño gang member. He further testified to his opinion the burglary was committed for the benefit of the Norteño gang because guns and items of value were stolen by Norteño gang members, increasing the notoriety and status not just of these individual gang members, but also of the Norteño gang. Finally, there was also evidence that, prior to the burglary, Flores's older brother Ray brought over the rifle that was found on the other side of Lara's house, and he did so because Espinoza had "got jumped" and "beat up" by some Sureño gang members, further evidencing his status as a Norteño gang member.

Based on the foregoing evidence, each defendant was convicted of the substantive gang crime (Count 11) and found to qualify for a gang enhancement attached to the burglary (Count 2). Flores was also found to qualify for gang enhancements attached to his possession of a firearm by a minor (Count 6) and receiving stolen property (Count 8) convictions.

## C.

### *"Associational or Organizational Connection"*

Defendants argue the evidence was insufficient to establish an "associational or organizational connection" between the Norteño gang in which they were convicted of participating and found to have committed a burglary to benefit, and the Norteño subsets whose members committed the predicate offenses and engaged in criminal primary activities, as required by our Supreme Court's decision in *Prunty*, *supra*, 62 Cal.4th 59. They are mistaken.

In *Prunty*, *supra*, 62 Cal.4th 59, our Supreme Court held that where, as here, "the prosecution's case positing the existence of a single 'criminal street gang' . . . turns on the existence and conduct of one or more gang subsets, . . . the prosecution must show some associational or organizational connection uniting those subsets." (*Id.* at p. 71.) The court continued: "That connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization. [¶] Whatever theory the prosecution chooses to demonstrate that a relationship exists, the evidence must show that it is the same 'group' that meets the definition of section 186.22(f)—i.e., that the group committed the predicate offenses and engaged in criminal primary activities—and that the defendant sought to benefit under section 186.22[, subdivision] (b). But it is not enough . . . that the group simply shares a common name, common identifying symbols, and a common enemy. Nor is it permissible for the prosecution to introduce evidence of different subsets' conduct to satisfy the primary activities and predicate offense requirements without demonstrating that those subsets are somehow connected to each other or another larger group." (*Id.* at pp. 71-72, fns. omitted.)

Here, Lara admitted to being a Norteño gang member, but denied being a member of any particular subset. Substantial evidence also establishes Flores and Espinoza were Norteño gang members, the former claiming membership in the Triple Six subset and the latter claiming membership in the resurgent Barrio Conway subset. Lucero was also a Norteño gang member, although his subset, if he claimed one, was not specified.

43

Detective Mercado testified these Norteño gang members committed the burglary for the benefit of the "Norteño criminal street gang," not any particular subset. The crime benefitted the gang because stealing guns from a house "adds guns into the gang itself" that "[t]hey can share . . . amongst themselves," thereby "furthering their status as a gang." The theft of other valuable items from the house was also gang-related because having these items, or selling them for "a handful of money," increased their notoriety as gang members. We conclude the collaboration of these defendants, all of whom considered themselves "Norteños," in the commission of this burglary, as well as their prior routine association with each other, sufficiently connected each defendant to each other's subset. In other words, the "Norteño criminal street gang" defendants were found to have benefitted by committing the burglary, and in which they were convicted of participating, included both Barrio Conway and Triple Six as subsets. (See *Prunty*, *supra*, 62 Cal.4th at p. 72 ["to be part of a 'criminal street gang,' subsets must share some associational or organizational connection with the larger group, whether arising from individual members' routine collaboration with each other or otherwise"].) Thus, as long as the predicate offense and primary activities requirements are satisfied by evidence of conduct engaged in by members of either Barrio Conway or Triple Six, or by members of another subset with a sufficient associational or organizational connection to one of these subsets, the requirements of *Prunty* will have been met.

We begin with the predicate offenses. With respect to the first such offense, Detective Mercado testified a member of the Triple Six subset was convicted of possession of a controlled substance for sale and possession of a firearm by a gang participant. However, the documents he relied upon while testifying established that, pursuant to a negotiated plea agreement, this Triple Six gang member was actually convicted of two counts of possession of a controlled substance for sale and charged

44

with, although not convicted of, possession of a firearm by a gang participant. He was also found to have been armed with a firearm during the commission of one of the narcotics offenses.

As defendants point out in their supplemental briefs, while possession of a controlled substance for sale is a predicate offense under section 186.22, subdivision (e), the instruction given to their respective juries defined "pattern of criminal gang activity" to mean: "The commission of, or attempted commission or conspiracy to commit or conviction of possession of an assault weapon, possession of a firearm, drug sales while armed, active participation in a criminal street gang." Thus, as far as the juries knew, possession of a controlled substance for sale was not a predicate offense and could not have been used to satisfy the predicate offense requirement. (See *People v. Garcia* (2014) 224 Cal.App.4th 519, 525 (*Garcia*) [where jury was not instructed predicate offenses could be proved by "commission" of such offenses, but instead incorrectly instructed "conviction" was required, commission of a predicate offense "could not have been used by the jury . . . to satisfy the predicate offense requirement"]; *People v. Kunkin* (1973) 9 Cal.3d 245, 251 [appellate court "cannot look to legal theories not before the jury in seeking to reconcile a jury verdict with the substantial evidence rule"].) This does not, however, end the inquiry. The jury was informed possession of a firearm was a predicate offense. And, unlike *Garcia*, the jury was also informed the predicate offense requirement could be satisfied by the "commission" of such an offense. Thus, while the Triple Six gang member was not convicted of possession of a firearm by a gang participant, he was charged with that crime and found to have been so armed during the commission of the narcotics offense. This is sufficient evidence of the commission of this predicate offense. (See *In re I.M.* (2005) 125 Cal.App.4th 1195, 1207-1208

[evidence a gang member was prosecuted for a predicate offense, without a showing he or she was convicted, was sufficient evidence of "commission" of such an offense].)

The second predicate offense to which Detective Mercado specifically testified was committed by a member of the East Side Stockton subset. The detective also testified the East Side Stockton subset previously collaborated with the South Side Stockton subset in the trafficking of guns and narcotics. He further testified the Triple Six subset was formed out of the South Side Stockton subset. However, at the time of the commission of the crimes in this case, Triple Six and South Side Stockton appear to have been separate subsets. There being no evidence of any associational or organizational connection between the East Side Stockton subset and either the Triple Six or Barrio Conway subsets, we must disregard this as a predicate offense.

The Attorney General does not argue otherwise. Instead, she asserts we are not limited to the two crimes specifically described as predicate offenses during Detective Mercado's testimony and points out the detective also testified to an incident in which Flores was contacted with four other Norteño gang members, one of whom was found to be in possession of a firearm. This individual was a member of the Triple Six subset. We agree. Again, "[b]ecause section 186.22, subdivision (e) contains both the options of 'commission' or 'conviction,' the statute expressly does not require that the offense necessarily result in a conviction." (*Garcia*, *supra*, 224 Cal.App.4th at p. 524.) We conclude this testimony sufficiently establishes commission of such an offense.

We further note with respect to Flores and Espinoza that their jury would also have been justified in considering Flores's conviction for possession of a firearm by a minor in this case as one of the predicate offenses establishing a pattern of criminal gang activity. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 624 [currently charged offense may be used as one of the predicate offenses in establishing a pattern of criminal gang

46

activity].)  Flores was shown to be a Triple Six gang member and this crime was found to have been committed for the benefit of the Norteño criminal street gang.

Finally, Detective Mercado's testimony also sufficiently established the Norteño gang, limited here to the Triple Six and Barrio Conway subsets (as these were the only subsets shown to be sufficiently connected to the defendants in this case), engaged in criminal primary activities.  "[E]vidence of either past or present criminal acts listed in subdivision (e) of section 186.22 is admissible to establish the statutorily required primary activities of the alleged criminal street gang. . . . The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes be one of the group's 'chief' or 'principal' occupations.  [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members."  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.)  Here, as previously mentioned, the detective testified one of the Norteño gang's primary activities is the commission of a number of criminal acts listed in section 186.22, subdivision (e), including murder, burglary, robbery, rape, and the trafficking of weapons and narcotics. With respect to the latter category of crimes, the detective recounted several police operations resulting in the arrests of Norteño gang members for drug trafficking and weapons offenses.  While defendants are correct to point out none of these operations involved members of the Triple Six or Barrio Conway subsets, other evidence sufficiently connected these subsets to the crimes the detective testified were primary activities of the Norteño gang.  Specifically, the predicate offenses noted above and the crimes committed in this case support a reasonable conclusion members of the Triple Six subset routinely commit crimes enumerated in section 186.22, subdivision (e).  Contrary to Espinoza's argument on appeal, we cannot conclude these crimes are merely "sporadic," as opposed to one of the group's principal occupations.

47

In sum, Detective Mercado's testimony, and other evidence in the record, sufficiently establishes the "Norteño criminal street gang" defendants actively participated in and benefitted by committing the burglary was "the same 'group' that . . . committed the predicate offenses and engaged in criminal primary activities" within the meaning of section 186.22. (*Prunty*, *supra*, 62 Cal.4th at p. 71.)

**D.**

*Espinoza's Remaining Arguments*

Espinoza also challenges the sufficiency of the evidence to establish: (1) his particular Norteño subset, Barrio Conway, qualifies as a "criminal street gang" within the meaning of section 186.22; (2) he actively participated in either the Barrio Conway subset or the overarching Norteño gang within the meaning of subdivision (a) of that section; and (3) the burglary he admittedly committed with Lara and Flores was "gang-related," i.e., committed for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of subdivision (b).[18] We disagree with each contention.

First, the prosecution was not required to prove Barrio Conway, by itself, satisfied section 186.22's definition of "criminal street gang." Instead, for the gang crime, the prosecution was required to prove Espinoza actively participated in "*any criminal street gang* with knowledge that its members engage in or have engaged in a pattern of criminal

---

[18]    Flores joins in these arguments, although he provided no additional briefing of his own. Espinoza's assertion Barrio Conway does not qualify as a "criminal street gang" does not apply to Flores because Flores did not claim Barrio Conway as his subset. There is more than sufficient evidence to support the fact Flores claimed Triple Six as his subset. Moreover, for the same reasons we reject Espinoza's remaining claims, we also conclude substantial evidence supports the jury's conclusion Flores actively participated in and committed a burglary to benefit a Norteño gang that included both Barrio Conway and Triple Six as subsets.

gang activity" and "willfully promot[ed], further[ed], or assist[ed] in any felonious criminal conduct by members of that gang." (§ 186.22, subd. (a), italics added.) For the gang enhancement attached to the burglary, the prosecution was required to prove that crime was committed "for the benefit of, at the direction of, or in association with *any criminal street gang*, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b), italics added.) That same "criminal street gang" has to meet subdivision (f)'s definition of that term. (*Prunty*, *supra*, 62 Cal.4th at pp. 71-72.) Here, the prosecution's theory was Espinoza actively participated in and committed the burglary to benefit the "Norteño criminal street gang," not just his individual subset. As we have already explained, his claiming Barrio Conway as his subset, and his criminal collaboration and routine association with Norteño gang members who either claimed no subset or claimed Triple Six as their subset, sufficiently tied him to a larger Norteño gang that included both Barrio Conway and Triple Six as subsets therein. This larger Norteño gang, albeit a much smaller segment of the gang than exists at large in Stockton, was proven to satisfy subdivision (f)'s definition of "criminal street gang." No more is required.

Second, there is sufficient evidence Espinoza actively participated in this larger Norteño gang. Detective Mercado testified to one police contact in which Espinoza was contacted with a member of the Triple Six subset and identified as belonging to the Barrio Conway subset. Items indicating he claimed Barrio Conway as his subset were found in his house and in his possession in juvenile hall. Espinoza also participated in the burglary in this case, with three other Norteño gang members, including one who claimed Triple Six as his subset. Together, this evidence sufficiently establishes Espinoza's active participation in a criminal street gang within the meaning of section 186.22, subdivision (a).

Nor are we persuaded by Espinoza's reliance on Detective Mercado's statement Barrio Conway was no longer a "validated" Norteño subset. Contrary to Espinoza's argument on appeal, this does not mean "there was no substantial evidence to connect 'Barrio Conway' to the Norteños." As previously stated, while the detective testified Barrio Conway was removed from the police department's list of validated Norteño subsets sometime in the 1990's, he also explained that in "recent years" there had been an "emergence of new Barrio Conway gang members that were seen tagging in the Conway area." This indicates a resurgence of Barrio Conway as a subset of the Norteño gang. And, while this new Barrio Conway subset may not, by itself, satisfy the STEP Act's definition of "criminal street gang," this does not mean its members are not also Norteños. The fact a Norteño gang member claims an up-and-coming subset should not insulate that gang member from STEP Act liability where, as here, that member actively participates in criminal gang activity with other Norteño gang members. By doing so, that member actively participates in a Norteño criminal street gang that is at least as large as the subsets claimed by each participant.

Finally, there is also sufficient evidence Espinoza committed the burglary for the benefit of this larger Norteño gang. As previously stated, Detective Mercado testified the burglary benefitted the gang because stealing guns from a house "adds guns into the gang itself" that "[t]hey can share . . . amongst themselves," thereby "furthering their status as a gang." The theft of other valuable items from the house was also gang-related because having these items, or selling them for "a handful of money," increased their notoriety as gang members. This evidence sufficiently establishes the crime was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b).

50

## E.

### *Elizalde and Sanchez Errors*

Having determined the totality of the evidence admitted against defendants on the gang issues amounted to sufficient substantial evidence to support their gang crime convictions and enhancement findings, we must now determine whether reversal of these convictions and findings is nevertheless required by *Elizalde*, *supra*, 61 Cal.4th 523, or *Sanchez*, *supra*, 63 Cal.4th 665.

In *Elizalde*, *supra*, 61 Cal.4th 523, our Supreme Court held routine gang affiliation questions asked during the process of booking the defendant into jail amounted to "interrogation" for purposes of triggering his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*) because such questions were "reasonably likely to elicit an incriminating response" in light of California's "comprehensive scheme of penal statutes aimed at eradicating criminal activity by street gangs," and therefore, the defendant's un-*Mirandized* responses to such questioning were inadmissible against him during the prosecution's case-in-chief. (*Elizalde*, *supra*, 61 Cal.4th at pp. 538-540.) However, the error was harmless under the beyond a reasonable doubt standard of prejudice, i.e., that of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705], because three witnesses provided uncontradicted testimony they knew the defendant to be a gang member. (*Elizalde*, *supra*, at p. 542.)

Here, as mentioned, each defendant admitted his gang membership during a booking interview without the required *Miranda* advisements. We allowed the parties to address in supplemental briefs whether the admission of these statements violated *Elizalde, supra,* 61 Cal.4th 523. Flores and Espinoza submitted briefs arguing *Elizalde* was violated and the error was prejudicial. In response, the Attorney General assumed

51

such a violation occurred, but argued the error was harmless.[19] We agree with Flores and Espinoza that *Elizalde* error occurred and address prejudice cumulatively with the *Sanchez* error, to which we now turn.

In *Sanchez*, *supra*, 63 Cal.4th 665, our Supreme Court held: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id*. at p. 686, fn. omitted.) There, the prosecution's gang expert based his opinion the defendant was a member of a certain gang on various police contacts, during which the defendant was in the company of members of that gang, and on statements he made when given a "STEP notice" informing him he was associating with a known gang. (*Id*. at pp. 672-673.) The expert admitted he had never met the defendant, was not present when the STEP notice was given or during any of the police contacts, and his knowledge of these matters was derived from police reports and a field identification (FI) card. (*Id*. at p. 673.)

The court held these case-specific out-of-court statements in the police reports, STEP notice, and FI card were hearsay because they were "considered by the expert, and offered to the jury, as true." (*Sanchez*, *supra*, 63 Cal.4th at p. 684.) The court continued: "Ordinarily, an improper admission of hearsay would constitute statutory error under the

---

[19] Lara did not submit a brief on the matter, probably because he also admitted to being a Norteño gang member during his trial testimony, making any *Elizalde* error manifestly harmless as to him.

Evidence Code. Under [*Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177]], however, if that hearsay was testimonial and *Crawford*'s exceptions did not apply, [the] defendant should have been given the opportunity to cross-examine the declarant or the evidence should have been excluded." (*Id.* at p. 685.) Turning to the testimonial nature of the statements, the court held the police reports were testimonial because they "relate[d] hearsay information gathered during an official investigation of a completed crime" and were not "made in the context of an ongoing emergency . . . or for some other primary purpose." (*Id.* at p. 694.) The court also held the portion of the STEP notice relied upon by the expert during his testimony was testimonial, explaining, "[t]hat portion recorded [the] defendant's biographical information, whom he was with, and what statements he made," and the officer who recorded that information did so primarily "to establish facts to be later used against [the defendant] or his companions at trial." (*Id.* at p. 696.) Finally, the court noted the record did not reveal enough of the circumstances surrounding the preparation of the FI card to determine whether or not it was testimonial in nature, but "[i]f the card was produced in the course of an ongoing criminal investigation, it would be more akin to a police report, rendering it testimonial." (*Id.* at p. 697.)

Here, too, Detective Mercado testified from police reports generated by other officers during official investigations of completed crimes. With respect to Espinoza, the detective testified one such report indicated he was contacted with a Triple Six gang member and identified by a citizen as belonging to a Norteño subset called Barrio Conway. With respect to Flores, Detective Mercado testified to the contents of another police report indicating he was contacted with four Norteño gang members, including the same Triple Six member with whom Espinoza was contacted. This gang member was found to be in possession of a firearm. As we explained previously, the latter's

53

possession of a firearm supplied the missing predicate offense necessary to satisfy the associational or organizational connection requirement of *Prunty*, *supra*, 62 Cal.4th 59. This alone requires reversal of Lara's gang conviction and enhancement finding. In other words, as to Lara, without the improperly admitted testimonial hearsay regarding the missing predicate offense, the prosecution would not have proved every element of either the gang crime or the gang enhancement.

As for Flores and Espinoza, as also explained previously, their jury was instructed it could consider their present offenses in determining whether or not a pattern of criminal gang activity had been proved, allowing Flores's possession of a firearm in the present case to serve as the missing predicate offense to support their gang crime convictions and enhancement findings. Accordingly, as to these defendants, we must determine whether the improper admission of the testimonial hearsay noted above and their booking interview admissions were prejudicial, not because they supplied the only evidence of a necessary element, but because we cannot conclude beyond a reasonable doubt the jury would have convicted them of the gang crime and found true the gang enhancement allegations had the evidence been properly excluded. We conclude the errors are prejudicial. Setting this evidence aside, little remains to establish Flores and Espinoza were active gang participants who burglarized a house to benefit their gang rather than simply two young teenagers engaging in felonious conduct with two older gang members, to be sure, but without the necessary knowledge or specific intent requirements of the gang crime or enhancement.

## LARA'S REMAINING CONTENTS

## III

### *Instructions Regarding the Natural and Probable Consequences Doctrine*

Lara contends the trial court prejudicially erred by providing his jury with erroneous and confusing instructions regarding the natural and probable consequences doctrine. Specifically, he argues CALCRIM No. 403 erroneously instructed the jury "he could be convicted of first-degree premeditated murder based on the natural and probable consequences of his intentionally aiding and abetting the target crime of assault" that is "no longer a possibility" after *Chiu*, *supra*, 59 Cal.4th 155. He also argues the trial court's delivery of CALCRIM No. 875, defining the crime of assault with a deadly weapon or by force likely to produce great bodily injury, was "garbled" and "'an unfortunate mess.'"

Our conclusion in part I of this opinion that Lara's first degree murder conviction must be reduced to second degree murder makes it unnecessary to address his first argument. Even assuming the jury misunderstood CALCRIM No. 403 to allow conviction of first degree murder under the natural and probable consequences doctrine, we are modifying the judgment to reflect conviction of second degree murder. However, because Lara argues certain misstatements made during the delivery of CALCRIM No. 403 also contributed to the likely confusion engendered by the erroneous delivery of CALCRIM No. 875, we provide the relevant portions of both instructions immediately below and then address Lara's specific argument, concluding the error was manifestly harmless.

# A.

## *The Challenged Instructions*

Lara's jury was instructed on the natural and probable consequences doctrine with CALCRIM No. 403 as follows:

"Before you may decide whether the defendant is guilty of murder, you must decide whether he is guilty of assault by means likely to produce great bodily injury.

"To prove that the defendant is guilty of murder, the People must prove, one, the defendant is guilty of assault by means likely to produce great bodily injury; two, during the commission of assault by means likely to produce great bodily injury, a coparticipant in that assault committed the crime of murder; and three, under all circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the assault by means likely to [produce] great bodily injury.

"A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or an innocent bystander.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"If murder was committed for a reason independent of the common plan to commit the assault by means likely to produce great bodily injury, then the commission of murder was not a natural and probable consequence of assault by means likely to produce great bodily injury.

"To decide whether the crime of murder was committed, please refer to the separate instructions that I have given you on that crime.

56

"The People are alleging that the defendant originally intended to aid and abet assault by means likely to produce great bodily injury. If you decide that the defendant aided and abetted *one of these crimes* and that murder was a natural and probable consequence of that crime, the defendant is guilty of murder. You do not need to agree about *which of these crimes* the defendant aided and abetted." (Italics added.)

Immediately following CALCRIM No. 403, Lara's jury was instructed with CALCRIM No. 875, defining the crime of assault with a deadly weapon or by force likely to produce great bodily injury. As orally delivered to the jury, the instruction provided in relevant part:

"To prove that the defendant is guilty of this crime, the People must prove that -- this is *assault with a deadly weapon or force likely to produce great bodily injury*; *one, that the defendant did an act with a deadly weapon other than that firearm. A firearm by its nature would directly and probably result in the application of force to a person. The defendant did an act by its nature that would directly and probably result in the application of force to a person and that the force used was likely to produce great bodily injury. Those were all number one.* Number two, the defendant did the act willfully. Number three, when the defendant acted, he was aware of the facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone. And four, when the defendant acted, he had the present ability to apply force likely to produce great bodily injury *with a deadly weapon other than a firearm, with a firearm or with a semiautomatic firearm to a person.*" (Italics added.)

Because some of the confusion asserted on appeal stems from the way in which the court reporter transcribed the oral delivery of the instruction, we also provide the version of the foregoing paragraph that appears in the written instructions: "To

57

prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant did an act with a deadly weapon other than a firearm/a firearm that by its nature would directly and probably result in the application of force to a person; [¶] 1A. The defendant did an act that by its nature would directly and probably result in the application of force to a person, and [¶] 1B. The force used was likely to produce great bodily injury; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, (he/she) he was aware of facts that would lead a reasonable person to realize that his (his/her) act by its nature would directly and probably result in the application of force to someone; [¶] AND [¶] 4. When the defendant acted, he (he/she) had the present ability to apply force likely to produce great bodily injury with a deadly weapon other than a firearm, with a firearm, with a semiautomatic firearm to a person."

**B.**

*Analysis*

Lara argues the combination of the singular/plural disagreement in CALCRIM No. 403 and the trial court's failure to eliminate irrelevant bracketed language in CALCRIM No. 875 resulted in confusing instructions and "'exactly the same type of error that was described and found reversible in [*People v. Gloria* (1975) 47 Cal.App.3d 1 (*Gloria*)].'" We agree these instructions were confusing, but conclude the error was harmless.

The instructions first said there was one target crime, i.e., "assault by means likely to produce great bodily injury." Then the instructions suggested there may be more than one target crime. Then, in defining the asserted target crime, now titled, "assault with a deadly weapon *or* force likely to produce great bodily injury," the instructions defined that crime as requiring proof that: (1) "The defendant did an act with a deadly weapon other than a firearm/a firearm that by its nature would directly and probably result in the

58

application of force to a person" and "[t]he force used was likely to produce great bodily injury"; (2) "The defendant did that act willfully"; (3) "When the defendant acted, . . . he was aware of facts that would lead a reasonable person to realize that his . . . act by its nature would directly and probably result in the application of force to someone"; and (4) "When the defendant acted, he . . . had the present ability to apply force likely to produce great bodily injury with a deadly weapon other than a firearm, with a firearm, with a semiautomatic firearm to a person."

The instructions should have been consistent. If the target crime was assault by means of force likely to produce great bodily injury, as CALCRIM No. 403 indicated, CALCRIM No. 875 should have omitted reference in element (1) to "a deadly weapon other than a firearm/a firearm" and in element (4) to producing great bodily injury "with a deadly weapon other than a firearm, with a firearm, with a semiautomatic firearm." Additionally, CALCRIM No. 403 should have omitted reference to the possibility of there being more than one target offense. If, on the other hand, target crimes were asserted, i.e., assault by means likely to produce great bodily injury, *or* assault with a deadly weapon other than a firearm, *or* assault with a firearm, *or* assault with a semiautomatic firearm, then CALCRIM No. 403 should not have listed only *one* such crime, and then, inconsistently told the jurors they did not need to agree on "which of these *crimes* the defendant aided and abetted." (Italics added.)

Nevertheless, when read together, we do not believe the jury would have been misled in a way that prejudiced Lara. CALCRIM No. 403's singular/plural disagreement indicated to the jury there was more than one asserted target offense, which was confirmed immediately thereafter in CALCRIM No. 875. With respect to the latter instruction, the Attorney General acknowledges the manner in which this instruction was delivered might have misled the jury into believing "that force likely to produce great

bodily injury must have been committed with a deadly weapon, including a firearm," but argues this "inured to [Lara's] benefit." We agree. An assault by means of force likely to produce great bodily injury does not require use of a deadly weapon. (See § 245, subd. (a)(1); *People v. Martinez* (2005) 125 Cal.App.4th 1035, 1043.) While the instruction delivered to Lara's jury suggested both were required, this increased the prosecution's burden with respect to proving Lara aided and abetted such an assault, inuring to Lara's benefit rather than his detriment.

Lara's reliance on *Gloria*, *supra*, 47 Cal.App.3d 1, is also misplaced. There, the trial court delivered an instruction informing the jury evidence of the defendant's attempted suppression of evidence, whether by the intimidation of a witness, an offer to compensate a witness, or destroying evidence, may be used as circumstantial evidence of his consciousness of guilt. However, there was no evidence the defendant intimidated or bribed any witness or destroyed any evidence. (*Id.* at p. 5.) The Court of Appeal held the giving of this instruction was reversible error, explaining: "Implicit in the giving of instructions is the notion factual questions to which the instructions relate are presented to the jury for determination. Yet no evidence in the record supports the giving of the instruction as it appears before us. The erroneous giving of the factually unsupported instruction is not cured by giving a later instruction that applies to a state of facts it determines does not exist. This latter instruction but highlights the implication the jury must make a factual determination concerning the bribery or intimidation of witnesses and the destruction of evidence. At the least the instruction is confusing. At worst it suggests serious wrongdoing on the part of [the defendant]." (*Id.* at p. 7.) Thus, reversal was required by "the giving of a factually unsupported instruction which suggested wrongdoing." (*Ibid.*) Here, in stark contrast to *Gloria*, the challenged instruction was supported by substantial evidence. As we have already explained in great detail, there is

60

sufficient substantial evidence to support the conclusion Lara aided and abetted an assault *with a firearm* in the carport area. No reasonable juror would have found such an assault was not also likely to produce great bodily injury. *Gloria* is therefore inapposite.

Simply put, while the delivery of CALCRIM Nos. 403 and 875 was potentially confusing, the error was manifestly harmless.

## IV

### *Unanimity Instruction*

Lara also claims the trial court prejudicially erred by failing to provide the jury with a unanimity instruction because the prosecution relied on multiple factual scenarios to support the murder charge. He is mistaken.

A criminal defendant has a constitutional right to a unanimous jury verdict, meaning "the jury must agree unanimously the defendant is guilty of a *specific* crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1131.) Thus, "if one criminal act is charged, but the evidence tends to show the commission of more than one such act, '*either* the prosecution must elect the specific act relied upon to prove the charge to the jury, *or* the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act.' [Citation.]" (*People v. Napoles* (2002) 104 Cal.App.4th 108, 114.) In such a case, where no election has been made by the prosecution, the trial court possesses a sua sponte duty to provide a unanimity instruction. (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 274-275.)

"On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty. [Citation.] The crime of burglary provides a good illustration of the difference between discrete crimes, which

61

require a unanimity instruction, and theories of the case, which do not. Burglary requires an entry with a specified intent. [Citation.] If the evidence showed two different entries with burglarious intent, for example, one of a house on Elm Street on Tuesday and another of a house on Maple Street on Wednesday, the jury would have to unanimously find the defendant guilty of at least one of those acts. If, however, the evidence showed a single entry, but possible uncertainty as to the exact burglarious intent, that uncertainty would involve only the theory of the case and not require the unanimity instruction. [Citation.] Other typical examples include the rule that, to convict a defendant of first degree murder, the jury must unanimously agree on guilt of a specific murder but need not agree on a theory of premeditation or felony murder [citation], and the rule that the jury need not agree on whether the defendant was guilty as the direct perpetrator or as an aider and abettor as long as it agreed on a specific crime [citation]." (*People v. Russo*, *supra*, 25 Cal.4th at pp. 1132-1133.)

Here, even accepting Lara's premise there were two separate crime scenes, i.e., the carport area where the initial assault with a firearm occurred and the sidewalk next door where the fatal shots were fired, this does not mean there were two murders. There was one murder. Under the prosecution's various theories of this single crime, Lara was either the direct perpetrator of the murder or an aider and abettor in the crime that began in the carport area with an assault with a firearm and was completed on the sidewalk next door, or he was the direct perpetrator of the assault with a firearm in the carport area or an aider and abettor in that crime, the natural and probable consequence of which was the murder that happened on the sidewalk next door. These are separate theories of liability for a single crime, Lucero's murder. The jury "need not have unanimously agreed on the precise factual details of how [the] killing under one or the other theor[ies] occurred in

order to convict defendant of [this] murder." (*People v. Pride* (1992) 3 Cal.4th 195, 250.) We therefore reject Lara's assertion a unanimity instruction was required.

V

### *Instruction on Attempted Murder as a Lesser Included Offense*

Lara further asserts the trial court prejudicially erred by failing to instruct the jury on attempted murder as a lesser included offense to murder. This argument is based on the notion that because the shooting in the carport area was not immediately fatal, that shooting "was really only an attempted murder" regardless of the fact additional shots, likely from the same gun, completed the job next door. We disagree.

In a criminal case, the trial court "must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present. [Citations.] 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 645; *People v. Souza* (2012) 54 Cal.4th 90, 114.) "On appeal, we review independently whether the trial court erred in failing to instruct on a lesser included offense." (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

"An offense is a lesser included offense to a charged offense if the former is necessarily included in the latter. There are two tests to determine whether this is so: (1) if all of the elements of the lesser offense are included in the elements of the greater offense, or (2) if the allegations of the pleading describe the charged offense so that it necessarily includes all the elements of the lesser offense." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 642, citing *People v. Lopez* (1998) 19 Cal.4th 282, 288-289.)

Beginning with the elements test, murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188.)

63

Express malice "requires an *intent to kill* that is 'unlawful' because . . . ' "there is no justification, excuse, or mitigation for the killing recognized by the law." ' [Citation.] [¶] Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger. [Citations.]" (*People v. Elmore*, *supra*, 59 Cal.4th at p. 133.) Attempted murder, on the other hand, "requires the specific intent to kill," i.e., express malice, and "the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) Because attempted murder requires a greater mens rea, express malice, than does murder, which may be committed with either express or implied malice, the latter crime can "be committed without also necessarily committing [the former]" (*People v. Lopez*, *supra*, 19 Cal.4th at p. 288), and is not a lesser included offense under the elements test. (See also *People v. Bailey* (2012) 54 Cal.4th 740, 753 [no duty to instruct on attempted escape because it had a more specific intent requirement than the crime of escape].)

The pleading, however, charged Lara not simply with murder, but with first degree premeditated murder that required the jury to "find a 'killing . . . preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill,'" i.e., express malice. (*People v. Catlin* (2001) 26 Cal.4th 81, 151.) Attempted murder is a lesser included offense to first degree premeditated murder because "the sole distinction between [an attempted murder] and [a completed premeditated murder] is completion of the act constituting the crime." (*People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1248.)

We must therefore determine whether "there is substantial evidence that only the lesser crime was committed." (*People v. Birks* (1998) 19 Cal.4th 108, 112.) As we have already explained, there was insufficient substantial evidence Lara intended to kill Lucero

at all. Thus, just as his conviction for first degree premeditated murder was not supported by substantial evidence, neither was instruction on attempted murder as a lesser included offense to that crime. Conviction of the lesser included offense of second degree murder was, however, sufficiently supported by the evidence, as we have fully explained.

## VI

### *Ineffective Assistance of Counsel*

We also reject Lara's contention his trial counsel provided constitutionally deficient assistance by failing to request the jury be instructed with CALCRIM No. 625 on the effect of voluntary intoxication on his ability to formulate the intent to kill or to aid and abet either the murder or the assault with a firearm.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid*.) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" (*In re Harris*

(1993) 5 Cal.4th 813, 832-833; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

Here, as the Attorney General correctly observes, Lara's defense was that "he was an unsuspecting bystander who witnessed the murder of his friend." There was evidence to support this theory, in addition to Lara's own statements and testimony. There was also substantial evidence supporting the prosecution's contrary theory, at least with respect to second degree murder under the natural and probable consequences doctrine. The jury obviously did not believe Lara's version of events. In hindsight, it might have been advantageous to have requested an instruction on voluntary intoxication. But doing so would have placed an inconsistent defense before the jury. Thus, defense counsel might well have made a tactical decision to rely solely on the bystander defense rather than risk the jury viewing use of an intoxication defense as a tacit concession Lara played a larger role in the murder than his testimony let on. (See *People v. Jones* (1991) 53 Cal.3d 1115, 1138 ["presentation of conflicting defenses is often tactically unwise"].) It is not for this court to "second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

Having concluded there may be a satisfactory explanation for defense counsel's failure to request instruction on voluntary intoxication, we must reject Lara's assertion that counsel's performance fell below an objective standard of reasonableness.

## VII

### *Prosecutorial Misconduct*

Finally, Lara contends the prosecutor engaged in prejudicial misconduct by arguing inconsistent theories of the facts surrounding Lucero's death to the separate juries. Specifically, Lara argues the prosecutor claimed he fired the fatal shots when

addressing his jury and inconsistently claimed Flores did so when addressing the Flores/Espinoza jury. We need not determine whether such an inconsistency would amount to prosecutorial misconduct because the prosecutor did not argue Lara fired the fatal shots. We therefore reject the contention.

Before Lara's jury, the prosecutor argued Lara, Flores, and Espinoza were "the only people" who could have murdered Lucero, characterizing Lara's version of events as "elaborate" and "ridiculous," and referring to the person Lara claimed arrived in the dark car and murdered Lucero as "the phantom person." According to the prosecution's theory, two guns were used to murder Lucero.[20] At least one of the defendants shot Lucero in the carport area, all three participated in the beating, Lara and Espinoza dragged Lucero next door believing him to be dead, and then Flores and Espinoza got into the white car in order to leave the scene, taking the guns with them, while Lara remained at his house to try to dispose of the blood evidence on his clothes. After driving past Lucero and turning around, they saw him on his cell phone calling for help, pulled over, and then either Flores or Espinoza got out of the passenger seat and finished him off with several bullets to the head.

Before the Flores/Espinoza jury, the prosecutor also argued two guns were used to murder Lucero, calling Lara's claim there was one shooter "ridiculous" and again referring to the man he claimed committed the murder as a "phantom." Again, she argued each defendant participated in the beating in the carport area, adding that Lucero was "a big man," and defendants "were never going to be able to subdue, to control or take [him] out" in a "one-on-one" fight, but together they were "a killing mob." Again, she argued Lara and Espinoza dragged Lucero next door. Then, according to the

---

**20** As we have explained, this notion was based on several misstatements regarding the ballistics evidence adduced at trial.

67

prosecution's theory, Flores got into the passenger side of the white car that drove past Lucero, turned around, pulled up next to him while he was on his cell phone calling for help, and Flores finished him off with several bullets to the head.

Contrary to Lara's argument on appeal, at no point during the prosecutor's argument to his jury did she argue Lara fired the fatal shots. We must therefore reject his assertion the prosecutor engaged in prosecutorial misconduct by doing so.

REMAINING CONTENTIONS OF FLORES AND ESPINOZA

## VIII

### *Prosecutorial Misconduct*

Flores and Espinoza also claim the prosecutor engaged in prejudicial misconduct by arguing prosecutors are "advocates of the truth." Assuming the claim is properly preserved for review, and further assuming the prosecutor's comments were objectionable, any misconduct was harmless.

### A.

### *Additional Background*

Flores's defense counsel contended during his closing argument that the prosecutor was "stretching" and "spinning" the evidence. In apparent response, at the start of the prosecutor's rebuttal argument, she stated: "Let me be clear. I'm an advocate of truth and of the facts. I have nothing personal. It isn't personal with me. I don't know these defendants." Flores's defense counsel objected: "I'm going to object, Your Honor. An advocate, that's improper argument. She's a representative of the state. She can't personalize it." The trial court sustained the objection "as to personalizing." Defense counsel added: "I am the truth?" The trial court responded: "All right. Sustained as to personalizing." The prosecutor continued: "Deputy district attorneys represent the People of the State of California. That means everyone within it. And deputy district

68

attorneys are advocates of the truth." Defense counsel again objected, this time without stating the grounds. This objection was overruled.

The prosecutor then continued with her rebuttal argument, explaining her view that both Calvetti and Mike, the 911 caller across the street who described the shooting on the sidewalk next to Lara's house, had "credibility," but clarified: "I'm not suggesting or telling you what the truth is. You have to decide that." The prosecutor then asked the jury to consider Mike and Garcia had different vantage points with respect to the car that pulled up to Lucero as he lay on the sidewalk, acknowledged inconsistency in the evidence concerning the color of that car, and urged the jury not to ignore the fact the street lights were yellow, adding: "Could it have tinged something? Maybe. Could it not have? Maybe not. I don't know." She then stated: "I'm just asking you to consider all the facts, not just part of it. This isn't about spinning. This is about looking at all of it. Don't ignore any part of it. You ultimately decide, does it have some ring of truth to you or does it not?"

## B.

### *Analysis*

"Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such '"unfairness as to make the resulting conviction a denial of due process."' [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and '"it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct"' [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612.)

"Generally, '"[t]o preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish

69

the jury to disregard the improper argument.'" [Citation.] A failure to 'object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm.' [Citation.] '[T]he absence of a request for a curative admonition does not forfeit the issue for appeal if "the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request." [Citations.]' [Citation.]" (*People v. Mendoza* (2016) 62 Cal.4th 856, 905.)

Here, assuming the nonspecific objection the trial court overruled was meant to reassert the "improper argument" objection lodged and sustained "as to personalizing" immediately before, but this time focusing not on the "I" in the clarifying question ("I am the truth?"), but rather on the phrase "the truth" in that question, and further assuming the challenged comments were objectionable as "interject[ing] an extraneous generalization" about the role of a prosecutor in a criminal prosecution, which "'is not shared by all judges or courts,'" similar to the comments held to have been objectionable in *People v. Hawthorne* (1992) 4 Cal.4th 43 (i.e., "law enforcement has an obligation to ascertain 'the true facts surrounding the commission of the crime'"), as in that case, we conclude the comments were harmless. (*Id*. at pp. 59-60, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643.) As in *Hawthorne*, the comments were "relatively brief and, especially when viewed in context, hardly so inflammatory as to distract the jury from a thorough and reasoned evaluation of the evidence." (*Id*. at p. 60.) Indeed, here, immediately after making the arguably objectionable comments, the prosecutor clarified: "I'm not suggesting or telling you what the truth is. You have to decide that." Moreover, the challenged comments were made in connection with the prosecutor's recitation of her view of the evidence she believed demonstrated Flores and Espinoza's guilt of the murder, their conviction of which we have already held must be

70

reversed for insufficient evidence. We have also reversed their gang crime convictions and gang enhancement findings. The evidence supporting their remaining convictions and enhancement findings was very strong. With respect to these convictions and enhancement findings, we cannot conclude the challenged comments either deprived Flores and Espinoza of due process or that it is reasonably probable the outcome would have been different had the comments not been made.

## IX

### *Mistrial Motion*

We also reject Espinoza's final assertion the trial court erred in denying his motion for mistrial, made after the prosecutor failed to redact certain references in his police interrogation to having previously committed a robbery.

"'A mistrial should be granted if the [trial] court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 198.)

Here, despite agreement between the prosecutor and Espinoza's defense counsel that Espinoza's police interrogation required redaction to remove references to a prior robbery arrest, and the trial court's ruling that "they'll be redacted," two such references escaped redaction and made their way to the jury. In the first, toward the start of the interrogation, one of the detectives said: "Okay, and I don't . . . . And I don't wanna start this way with you. Okay? You, you've had some problems. You had this robbery thing, which I agree, I don't really know how that's a robbery, but whatever, that's not my business. I mean . . . I wasn't involved in that." In the second, toward the end of the interrogation, the other detective said: "I talked to your mom about, you know, she's

71

told, told me about how you follow the older kids and that they get you in trouble. Especially, I guess, this last, that robbery or whatever that thing was, it was the older kids. And she goes that, that you're worried about that, you're worried about talking about these things because you're thinking you're gonna get these kids in trouble and they're gonna do something to you or to the, or, or to your mom and them." After denying Espinoza's mistrial motion, the trial court ordered the prosecutor to provide the jury with a fully redacted transcript and video of the interrogation in the event the jury requested playback of the video during deliberations. The trial court also offered to give the jury a "corrective" instruction if Espinoza's counsel so desired. No such instruction was requested.

While the references to Espinoza having possibly committed a robbery should have been redacted, the trial court did not abuse its discretion in determining the prejudice flowing from these references was curable by admonition. As the trial court correctly observed, in the context of the interrogation as a whole, the objectionable references were fleeting. They were also phrased in a manner that would have indicated to the jury the detectives themselves believed "whatever that thing was," it was not a robbery. The latter reference also offered the possibility Espinoza was simply hanging out with the wrong group of people, which coincided with his defense in this case. In the context of the trial as a whole, these fleeting references to Espinoza being arrested for something that may or may not have been a robbery would not have "'irreparably damaged'" his chances of receiving a fair trial. (*People v. Welch* (1999) 20 Cal.4th 701, 749; *People v. Ayala* (2000) 23 Cal.4th 225, 282.)

DISPOSITION

The judgment entered against Alberto Francisco Ortega Lara is modified to reflect conviction of second degree murder in Count 1 and to reverse the gang crime conviction

72

in Count 11 and the gang enhancement attached to Count 2. The judgments entered against Issiah Flores and Aurelio Espinoza, III, are reversed as to their murder convictions in Count 1, gang crime convictions in Count 11, and gang enhancements attached to Count 2 (Flores and Espinoza), and Counts 6 and 8 (Flores only). In all other respects, the judgments are affirmed and the matters are remanded to the trial court, where the People shall have 60 days from the date of the remittitur in which to file an election to retry defendants on the reversed gang crime and enhancements. Following retrial, or if the People elect not to retry defendants, the trial court shall resentence them accordingly, shall cause their abstracts of judgment to be amended in a manner consistent with this disposition, and shall send certified copies of the amended abstracts to the Department of Corrections and Rehabilitation.

/s/
HOCH, J.

We concur:

/s/
BLEASE, Acting P. J.

/s/
BUTZ, J.