Filed 7/28/25  P. v. Hedlin CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>BRIAN DEAN HEDLIN,<br><br>     Defendant and Appellant. | A169581<br><br>(San Mateo County<br>Super. Ct. No. SC059521A) |

Defendant and appellant Brian Dean Hedlin (appellant) appeals following the trial court's denial of his petition for resentencing pursuant to Penal Code section 1172.6[1] (former section 1170.95).  We affirm.

BACKGROUND

This background summary is based on this court's prior nonpublished decision in *People v. Hedlin* (Dec. 29, 2010, A122793, A123172).[2]

---

[1] All undesignated section references are to the Penal Code.  Section 1170.95 was renumbered section 1172.6, without substantive change, effective June 30, 2022.  (Stats. 2022, ch. 58, § 10.)  For clarity, we will refer to the section by its current numbering.

[2] Appellant's March 24, 2025 request for judicial notice of the records in appeal number A123172 is granted.

1

The Prosecution's Evidence

In January 2005, Eduardo Z., who went by the nickname "Bulldog," was living in a third-floor apartment in South San Francisco with Gregorio C. Eduardo was dating Nelia L.; Gregorio was dating Janette B.[3]

One evening in late January 2005, Eduardo was "hanging out [and] drinking" with appellant and his girlfriend, Veronica M. At 2:00 or 3:00 a.m.—when Eduardo was "really drunk"—he spilled his beer and it splashed on appellant's daughter. When appellant started to complain, Eduardo told him that his daughter should not be up so late. The two men fought. Eduardo did not remember how the fight ended; he thought he passed out from drinking too much.

On January 30, 2005, Nelia and Eduardo went to bed in Eduardo's bedroom at the end of a hallway. Gregorio and Janette slept in a front bedroom. In the early morning on January 31, Eduardo heard people "beating" on the front door of the apartment. Gregorio asked who was there. He did not receive a response. When Gregorio opened the door, appellant and his brother Shawn H. entered the apartment. Appellant and his brother repeatedly asked Gregorio, "[W]here is Bulldog?" They argued with Gregorio, and then there was a gunshot. Janette ran out of Gregorio's bedroom when she heard the gunshot. She saw Gregorio lying on the living room floor. Appellant and his brother asked Janette, "[W]here is Bulldog, where is Bulldog?" Janette screamed and was shot in the center of her forehead. She lost consciousness.

---

[3] We refer to the victims and other persons by their first name and last name initial, to maintain their privacy. (Cal. Rules of Court, rule 8.90(b)(1) & (4).) For readability, after the first reference, we refer to those persons by their first name alone; no disrespect is intended.

Shortly thereafter, Eduardo's bedroom door was kicked open. As the door opened, Nelia saw appellant and his brother. She saw Shawn holding a gun in his right hand, and he "went straight to Bulldog." Eduardo tried to bundle himself with blankets to absorb the impact from a gunshot. Eduardo wrestled with Shawn and the gun fired, hitting Eduardo in the back. Shawn fumbled as he tried to reload the gun; appellant kicked Eduardo in the head and wrestled with him. At that point, appellant said, " '[S]hoot him, shoot him, shoot him, finish him off.' " As Eduardo lay on the ground, Shawn aimed his gun and shot Eduardo "about three times." Eduardo heard appellant and his brother laughing. When Shawn ran "out of bullets," Eduardo was able to get away.

As Nelia tried to get out of the bedroom, she saw appellant standing in the hallway, staring into the bedroom. He looked "angry" and as though he might be "on something." Appellant would not let Nelia leave the bedroom. She told appellant "to think about what he was doing and to talk to [Shawn], tell him to stop, think about his daughter" but appellant "wouldn't budge." Finally, Nelia was able to get out of the bedroom. As she ran to the bathroom, she saw Gregorio and Janette's bodies on the floor. Nelia jumped out of the bathroom window, hitting the ground three stories below and breaking her back. After some time, she got up and walked away, looking for help. She saw appellant running toward her, and she heard Shawn say, " '[G]et her.' " She turned a corner and began knocking on doors for help.

Police officers responded to neighbors' 911 calls and went to Eduardo's apartment at approximately 3:10 a.m. They saw Gregorio, dead in a pool of blood, and Janette in the hallway, mumbling and moaning. The officers had difficulty understanding what she was trying to say, but when they asked

3

her, "[W]ho did this," she clearly said, "Shawn." Officers also spoke to Eduardo, but he was uncooperative and would not tell them who shot him.

Several days after the incident, Eduardo found two containers of gasoline outside the front door of the apartment. Surveillance video from a gas station in South San Francisco showed appellant's girlfriend Veronica paying for approximately two gallons of gas at approximately 3:00 a.m. on January 31, 2005.

Appellant and his brother were arrested separately later the morning of January 31, 2005.

Appellant's Evidence

Veronica testified for appellant under a grant of immunity. She is his fiancée and the mother of his daughter. About a week before the incident on January 31, 2005, she and appellant were at a social gathering with several friends, including Eduardo. Late in the evening, Eduardo came up to Veronica, hit her on the head "for no reason," and spilled beer on her daughter, who started crying. Eduardo refused to apologize. This made appellant mad, and he and Eduardo fought. Later, Veronica told Shawn what happened.

In the evening on January 30, 2005, Veronica drank with appellant and his brother at her mother's house. She went to bed at approximately 11:30 p.m. Before she went to bed, she briefly talked with appellant and Shawn about the incident with Eduardo. Shawn said he was surprised Eduardo "had no respect." Some time later, appellant and Shawn came into Veronica's room and woke her because they wanted to drive her car to Eduardo's apartment. They said they wanted to go there to "get an apology and kick his ass." Veronica refused because they were drunk. Later, they returned and bugged her to take them to Eduardo's apartment. She agreed.

4

When they got into Veronica's car, appellant said he needed gas for his truck and put two empty jugs into the car. As Veronica drove toward Eduardo's apartment, she stopped at a gas station where appellant filled up the jugs with gas. When they arrived at Eduardo's apartment at 3:00 a.m., Veronica and appellant argued about the smell of gas in the car.

Appellant and his brother got out of the car; Shawn carried the gas containers. Veronica waited in the car. About 10 or 15 minutes later, she heard gunshots and screaming. Appellant and Shawn returned to the car. Appellant appeared "[s]erious" and said, " 'Greg [Gregorio] didn't deserve that, this shouldn't have happened.' " In response, Shawn said, " 'don't worry you didn't do nothing, it's all on me.' "

Appellant's blood alcohol level at approximately 9:00 a.m. on January 31, 2005 was 0.12. According to a forensic toxicologist, his blood alcohol level would have been approximately 0.20 to 0.22 at 3:00 a.m. A blood alcohol level of 0.20 impairs judgment and sensory input. A person with a 0.20 blood alcohol level could "be completely out of it."

Shawn's Evidence

Shawn testified that, on January 30, 2005, he and appellant "sat around [and] drank" at Veronica's mother's house until they became intoxicated. They talked about the incident between appellant and Eduardo. Shawn thought Eduardo had been disrespectful and wanted to go to Eduardo's apartment to "hash things out . . . to resolve it" because Eduardo had been like a brother to them. Appellant did not want to go to Eduardo's apartment—he wanted to stay away from Eduardo. Appellant eventually relented because Shawn "kept nagging at him." Shawn did not plan on beating Eduardo up and denied there was a plan to attack Eduardo or anyone else in the apartment.

5

Veronica drove the brothers to Eduardo's apartment because they were drunk. Along the way, they stopped at a gas station to get gas for appellant's truck. Appellant filled up two one-gallon containers of gas, and Shawn held the containers in the backseat of the car. When they arrived at Eduardo's apartment, Veronica and appellant argued about the smell of gasoline in the car. At that point, Shawn got out of the car with the gasoline containers and walked up to Eduardo's front door. He put the containers down and pounded on the door. Shawn brought the containers with him because they were making Veronica's car smell.

Gregorio answered the door. He was mad. As he opened the door, he said, " 'mother fucker, do you know what time it is?' " Shawn told Gregorio he wanted to speak to Bulldog; in response, Gregorio said he was "tired of this shit" and pointed a gun at Shawn. Shawn lunged at Gregorio and tried to get the gun. Shawn and Gregorio began wrestling and fighting. As they struggled, shots were fired. Janette jumped on Shawn's back. The gun fell to the ground and Shawn picked it up. He started shooting because he was scared and because he did not understand why Gregorio and Janette had "turned" on him.

Then Shawn ran into Eduardo's room. He pushed or kicked the door open because he wanted to get help and talk to Eduardo. Eduardo, who was standing on the bed, threw a blanket at Shawn and grabbed him. As Shawn and Eduardo wrestled, Shawn hit Eduardo with the gun and it fired. Shawn dropped the gun and ran out of the apartment.

Verdicts, Sentencing, and Resentencing Petition

The jury convicted both appellant and his brother of first degree murder (§ 187; count one), two counts of attempted murder (§§ 664, 187; counts two and three), false imprisonment (§ 236; count four), and first degree burglary (§ 460, subd. (a); count five). The jury also convicted Shawn of unlawful possession of a firearm (§ 12021, subd. (a)(1)). The jury also found various sentencing enhancements true, including a special allegation that the attempted murders were committed with premeditation and deliberation. The trial court sentenced appellant to a term of 50 years to life on count one, two consecutive life terms on counts two and three, and a consecutive determinate term. This court affirmed the judgment in *People v. Hedlin*, *supra*, A122793, A123172.

In 2022, appellant petitioned for resentencing pursuant to section 1172.6 (then section 1170.95). The trial court conducted an evidentiary hearing and denied the resentencing petition.[4] The present appeal followed.

DISCUSSION

Appellant contends the trial court erred in denying him relief under section 1172.6, because the evidence was insufficient to sustain the convictions for the murder of Gregorio and the attempted murder of Janette. He does not challenge rejection of the petition as to the attempted murder of Eduardo.

"Effective January 1, 2019, the Legislature passed Senate Bill [No.] 1437 [(2017–2018 Reg. Sess.)] 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to

---

[4] At the resentencing hearing, appellant presented evidence from a forensic psychologist who testified as an expert in juvenile brain development.

7

ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)  The enactment did not "alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator.' " (*People v. Offley* (2020) 48 Cal.App.5th 588, 595–596.)  "In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill [No.] 1437 added [former] section 1170.95 [now section 1172.6], which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis*, at p. 959.)  The relief also applies to "attempted murders based on the natural and probable consequences doctrine." (*People v. Coley* (2022) 77 Cal.App.5th 539, 548.)  It is undisputed that the instructions presented to the jury permitted appellant to be convicted of the murder of Gregorio and the attempted murder of Janette under the natural and probable consequences doctrine.

Where, as here, the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause and holds a hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subd. (d)(1); see also *Lewis*, *supra*, 11 Cal.5th at p. 960.)  "At this stage, '[t]he question is whether the petitioner committed [the underlying crime] under a still-valid theory, and that is a factual question.' " (*People v. Harris* (2024)

8

105 Cal.App.5th 623, 632.) The burden of proof is "on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3); see also *Harris*, at p. 632.)

The trial court's denial of appellant's section 1172.6 petition is reviewed for substantial evidence. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) "Under this familiar standard, ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citations.] Substantial evidence also ' "includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' " (*Ibid.*)

"[A] person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164; see also *In re K.M.* (2022) 75 Cal.App.5th

9

323, 327 (*K.M.*).) " ' "[T]he test is whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged him by words or gestures." ' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 411 (*Campbell*).) "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*People v. Lee* (2003) 31 Cal.4th 613, 624.)

Appellant contends the evidence was insufficient to establish that he took any action to aid or encourage Shawn in shooting Gregorio and Janette. To be sure, "liability for aiding and abetting ' "*require[s] some affirmative action*" ' that assists or encourages the commission of the crime." (*K.M.*, *supra*, 75 Cal.App.5th at p. 329, quoting *People v. Partee* (2020) 8 Cal.5th 860, 868.) Thus, "in general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission." (*Campbell, supra*, 25 Cal.App.4th at p. 409.) Nevertheless, presence and failure to interfere are " 'factors' " that may be considered in making the aiding and abetting determination, as well as " 'conduct before and after the offense' " (including flight) and the relationship (if any) between the defendant and the direct perpetrator (often referred to as " 'companionship' "). (*Ibid.*; *People v. Lara* (2017) 9 Cal.App.5th 296, 322 (*Lara*); *People v. Garcia* (2008) 168 Cal.App.4th 261, 273; accord, *People v. Ayala* (2024) 101 Cal.App.5th 62, 72.) All of those factors contextualize the defendant's actions and help the factfinder make reasonable inferences regarding a defendant's intent during the commission of a crime.

The decision in *Campbell*, *supra*, 25 Cal.App.4th 402 is instructive. There, the defendant and a companion approached robbery victims together, "concerted action [which] reasonably implies a common purpose." (*Id.* at p. 409.) During the robbery, the defendant "remained in position in front of" one of the victims, and, the court reasoned, "[s]ince there is no evidence he was surprised by [his companion's] conduct or afraid to interfere with it, the jury could reasonably conclude that [the defendant] assumed his position . . . to intimidate and block them, divert suspicion, and watch out for others who might approach. Such conduct is a textbook example of aiding and abetting. [Citations.] Thus, the evidence . . . reasonably indicates that [the defendant] played an affirmative supportive role in the attempted robbery and was not simply an innocent, passive, and unwitting bystander." (*Id.* at pp. 409–410; see also *People v. Salgado* (2001) 88 Cal.App.4th 5, 16 ["The jury could reasonably conclude that [the defendant] contributed to the threat that led [the victim] to surrender his car"].)

Similarly, in the present case, a reasonable inference is that appellant acted as his brother's backup, and his participation served to intimidate the victims, as well as to dissuade and overcome any resistance. There is no evidence that appellant reacted with surprise or objected to any of Shawn's acts of violence, and appellant's continued supportive presence encouraged those acts.[5] (Cf. *Lara*, *supra*, 9 Cal.App.5th at p. 322 [a defendant said, "[c]alm down"].) The evidence that moments later appellant was laughing

---

[5] As the trial court observed in its ruling regarding the shooting of Gregorio, "If this is not what [appellant] expected when he got in that car with Shawn and headed over to Eduardo's house, wouldn't that be the point where he says [']what are you doing['] or does something to stop his brother from continuing or jumps to go deal with the individual who he says is at issue? That doesn't happen."

11

and verbally encouraging Shawn's attack on Eduardo, and joined in kicking Eduardo in the head, is further evidence that appellant was not surprised by and did not object to the shootings of Gregorio and Janette. It is difficult to conceive of any other possible intent behind appellant's actions than facilitation and encouragement of his brother's course of conduct.

The present case is also analogous to *In re Juan G.* (2003) 112 Cal.App.4th 1. There, the defendant and his companion approached a victim and stood side-by-side while the companion drew a knife and demanded money. (*Id.* at pp. 5–6.) The defendant argued on appeal that he was an unwitting bystander and that the record " 'at most' " showed he "did nothing other than watch." (*Id.* at p. 5.) The Court of Appeal concluded the defendant aided the robbery by directly confronting the victim and standing "within touching distance," thereby helping to intimidate the victim while his companion took the victim's money. (*Ibid.*) Moreover, the defendant was with his companion "immediately prior to the robbery and during the attempted escape." (*Ibid.*) The same is true in the present case. The record amply supports an inference that appellant aided his brother throughout the events in the apartment by standing by his side and making the same verbal demands before the shootings. As the trial court observed, "[Appellant] never leaves his brother. They leave the house together. They get back into the car together."

The present case is distinguishable from this court's decision in *K.M.*, *supra*, 75 Cal.App.5th 323. There, the defendant was associated with two other youths, one of whom stole the victim's phone prior to a physical altercation. (*Id.* at p. 326.) "At most, there was substantial evidence that [the defendant] stood behind the victim and yelled, '[Y]ou hurt my friend, we're going to hurt you,' " during the altercation following the theft. (*Id.* at p.

12

329.) But because there was no "nexus" between the defendant's conduct and the earlier theft of the phone, there was insufficient evidence the defendant aided and abetted the theft. (*Ibid.*) Here, in contrast, appellant acted fully in concert with his brother before, during, and after the incident.

In his reply brief, appellant cites *People v. Collins* (2025) 17 Cal.5th 293 for its discussion of liability for failure to protect; appellant argues that, unlike the mother in *Collins*, he had no duty to act to protect Gregorio or Janette. *Collins* is inapposite, because appellant's liability is based on his active participation in Shawn's violent course of conduct; the liability is not based on his inaction in failing to protect the victims. As explained previously, although not alone sufficient to support liability, appellant's failure to interfere or object is circumstantial evidence that he shared Shawn's intent. And, although appellant's affirmative conduct was primarily his supportive presence, his actions need not have been a "substantial factor in the offense" in order to support the conviction. (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743.) " ' "Liability attaches to anyone 'concerned,' however slight such concern may be," ' " and extends to persons " 'present for the purpose of diverting suspicion, or to serve as a lookout, or to give warning of anyone seeking to interfere,' " and the like. (*Id.* at pp. 743–744; see also *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529 ["A person is 'concerned' and hence guilty as an aider and abettor if, with the requisite state of mind, that person in any way, directly or indirectly, aided the actual perpetrator by acts or encouraged the perpetrator by words or gestures"].)[6]

---

[6] Arguably, the evidence that appellant caused gasoline to be purchased and brought to the apartment also permits a reasonable inference that appellant and his brother intended to commit arson (a plan they apparently abandoned), which would further support the aiding and abetting finding.

13

In context, appellant's unwavering support, both physical and emotional, for his brother throughout the incident constituted affirmative actions that assisted and encouraged commission of the murder and attempted murder at issue. Appellant suggests that evidence of his probable blood alcohol level supported an inference that he was in an "alcoholic stupor" during the shootings. But the trial court was not obligated to make that inference, particularly where contradicted by appellant's actions in obtaining gasoline, making verbal demands with Shawn, assisting Shawn during the struggle with Eduardo, and briefly pursuing Nelia outside the apartment. It also would strain logic to conclude appellant was not an active participant in the incident, given that he had more of a motive for revenge because Eduardo spilled beer on *his* child and disrespected *him*, not Shawn. (See *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599 ["Motive is another circumstance to be considered in determining aiding and abetting liability"].)

Substantial evidence supports the trial court's finding that appellant aided and abetted the murder of Gregorio and attempted murder of Janette with intent to kill.

DISPOSITION

The trial court's order is affirmed.

---

However, because it is unnecessary to support the trial court's ruling, we need not rely on the gasoline evidence on appeal.

14

SIMONS, Acting P. J.

We concur.

BURNS, J.
CHOU, J.

(A169581)